694 A.2d 1045

ANTHONY JOHN CAMPIONE, PLAINTIFF–RESPONDENT/CROSS–APPELLANT, v. ADAMAR OF NEW JERSEY, INC., T/A TROP-WORLD CASINO AND ENTERTAINMENT RESORT; PAT SCULLY; AND MICHAEL IMPERATRICE, DEFENDANTS–APPELLANTS/CROSS–RESPONDENTS, AND WILLIAM PHIEL AND ETHEL GUYS, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued February 11, 1997—Decided June 9, 1997.

Before Judges D'ANNUNZIO, NEWMAN and VILLANUEVA.

*John J. Barry* argued the cause for appellants/cross-respondents (*Barry & McMoran,* attorneys; *Mr. Barry, Adam N. Saravay* and *Mark H. Sandson,* on the brief).

*F. Michael Daily, Jr.,* argued the cause for respondent/cross-appellant (*Quinlan, Dunne & Daily,* attorneys; *Mr. Daily,* on the brief).

*Ribis, Graham & Curtin,* attorneys for amicus curiae Casino Association of New Jersey (*Peter G. Sheridan* and *Peter D. Haytaian,* on the brief).

The opinion of the court was delivered by

D'ANNUNZIO, J.A.D.

Adamar of New Jersey, the operator of an Atlantic City casino known as Tropworld, and two of its employees, Pat Scully and Michael Imperatrice, appeal from a judgment in the amount of $1,519,873.43 entered on a jury's verdict. The judgment included an award of $300,625.87 against Tropworld and Imperatrice for discriminating against plaintiff because he was a card counter; an award of $219,034.06 against Tropworld and Scully as compensatory damages for malicious prosecution; and an award of $1,000,-213.50 for punitive damages against Tropworld on the malicious prosecution claim. Plaintiff cross-appeals regarding damages.

## I. *DISCRIMINATION AGAINST CARDCOUNTERS*

This case involves a 1989 episode in the conflict between Atlantic City's casinos and certain blackjack players known as card counters. *See, e.g., Uston v. Resorts Int'l Hotel, Inc.,* 89 *N.J.* 163, 445 *A.2d* 370 (1982). The Law Division addressed the issues in a pre-trial published opinion granting summary judgment to Adamar as to its right to shuffle cards at will, but denying Adamar's motion regarding Adamar's "right to discriminate against plaintiff in its implementation" of certain casino control regulations. *Campione v. Adamar of New Jersey, Inc.,* 274 *N.J.Super.* 63, 83, 643 *A.2d* 42 (Law Div.1993).

In 1982, the New Jersey Supreme Court addressed the right of a casino to exclude a patron from its premises solely because the patron was identified as a card counter. *Uston, supra.* The Court noted that the Casino Control Act (Act), *N.J.S.A.* 5:12-1 to -152, gives the Casino Control Commission (Commission) exclusive and plenary authority "to set the rules of licensed casino games, which includes the methods for playing those games." *Id.* at 166, 445 *A.2d* 370. Because the Commission had not authorized exclusion as a countermeasure, the Court concluded that the casino had no authority to exclude persons because they were card counters. *Ibid.*

In response to *Uston,* in 1982, the Commission authorized the use of certain measures to defeat card counters, but those measures did not authorize exclusion. The Commission empowered the casinos to employ the following countermeasures: (1) a method of shuffling the blackjack decks called the "Bart Carter Shuffle," *N.J.A.C.* 19:47-2.1; (2) increasing the number of decks from which the cards are dealt, *N.J.A.C.* 19:47-2.2; (3) the continuous shuffling shoe, *N.J.A.C.* 19:47-2.20; and (4) limiting the number of wagers per player, *N.J.A.C.* 19:47-2.14.

Thereafter, the Commission adopted two additional regulations applicable as cardcounting countermeasures. In 1991, the Commission added a regulation providing that

> a casino licensee may at any time change the permissible minimum or maximum wager at a table game, without notifying the Commission of such change, upon posting a sign at the gaming table advising patrons of the new permissible minimum or maximum wager and announcing the change to patrons who are at the table.
>
> [*N.J.A.C.* 19:47–8.3(c).]

In 1993, the Commission adopted a regulation, codified at *N.J.A.C.* 19:47–8.2(b), allowing a casino to offer:

> 1. Different maximum wagers at one gaming table for each permissible wager in an authorized game; and
>
> 2. Different maximum wagers at different gaming tables for each permissible wager in an authorized game.
>
> . . . .
>
> (d) Any wager accepted by a dealer which is in excess of the established maximum permitted wager at that gaming table shall be paid or lost in its entirety in accordance with the rules of the game, notwithstanding that the wager exceeded the current table maximum.

The 1991 and 1993 regulations were not in effect when the confrontation between plaintiff and defendant occurred. However, in addition to countermeasures contained in its regulations, the Commission approved Tropworld's internal controls relating to procedures and rules governing the conduct of particular games. The authority for those approvals is in *N.J.S.A.* 5:12–99a(16), and consequently they are referred to as section 99 controls. Tropworld's approved section 99 controls, in effect in 1989, included the casino's discretion to order a reshuffle at anytime and to permit a player to make more than one wager at a table and to exceed the table's betting limit.

The parties introduced the following evidence relevant to plaintiff's discrimination claim. Plaintiff, aged sixty-one at trial, became interested in blackjack and card counting after the first casino opened in Atlantic City in 1978, and he began reading books and taking lessons about those subjects. A "card counter" is a player who utilizes information concerning the cards remaining in the shoe to his advantage in both methods of playing and for betting. *Campione, supra,* 274 *N.J.Super.* at 69 n. 1, 643 *A.2d* 42. Plaintiff took a blackjack course from Doug Grant, an accomplished card counter, in 1985 and received a diploma as a master

blackjack player. He played blackjack primarily at TropWorld because, according to plaintiff, TropWorld offered "the best game in town" due to its favorable rules. Between 1985 and 1989, plaintiff's betting ranged from $100 to $400 a hand.

Plaintiff claimed that TropWorld would take certain counter-measures against him because he was a card counter; these measures included shuffling the deck before the cut card was reached, placing the cut card lower in the deck, dropping the maximum bet limit and restricting plaintiff to playing one hand. Plaintiff maintained that the casino would allow other players at the table to bet above the maximum and to play two hands, and allowed other players, but not him, to play the dealer one-on-one. According to plaintiff, TropWorld's employees would also try to make him feel unwelcome, would follow him around the casino, would talk to him while he was trying to card count and would tell other players at the table that plaintiff was responsible for the deck being shuffled prematurely. As a result of these counter-measures and actions, plaintiff would often put on disguises in an effort to conceal his identity.

In April 1989, while playing at TropWorld, plaintiff was not allowed to play two hands during one deal, and the floor person instructed the dealer to deal past plaintiff when he did not remove his chips from the betting circle. As a result, plaintiff filed a complaint with the Commission claiming discrimination. Several weeks later, the Commission informed him that the casino's actions did not constitute a violation of the Act and its implementing regulations.

On the afternoon of November 10, 1989, plaintiff was playing blackjack at a table at Tropworld which had a minimum bet of $25 and a maximum bet of $1000. Before sitting at the table, plaintiff was back counting, that is, card counting while not being seated at the table, and when he sat down there was only one other player at the table. Plaintiff bet several hands of $300 to $350, and was, for the most part, losing. At one point, plaintiff placed $350 in the betting circle, whereupon Michael Imperatrice, a floor supervisor

and a member of TropWorld's card counting team, changed the betting-limit sign at the table and told plaintiff that he could only bet $100 because of the reduced table limit. Plaintiff testified that Imperatrice told the other player at the table that he could bet up to $1000 if he so wished. Imperatrice instructed the dealer to deal and he pushed plaintiff's money out of the betting circle informing plaintiff that he wanted him to bet $100. Plaintiff pushed the $350 back in the circle and told Imperatrice that he wanted to continue to bet $350 in order to recoup his losses. Plaintiff received a ten or an eleven and sought to "double down" his bet by betting an additional $350. Plaintiff then received a nine or ten and won the hand. However, instead of receiving $700, plaintiff was given $200 as his winnings, apparently $100 for each of two bets.

Plaintiff refused to accept the payout and put his hands around the cards. Imperatrice told plaintiff that the bet was paid properly, at which point plaintiff asked to see someone from the Commission. Imperatrice replied that if plaintiff wanted to talk to the Commission, he would have to go to the Commission's booth at the casino. Imperatrice also told plaintiff that if he did not take his hands off of the cards, casino security would be called. When plaintiff refused to take his hands off the cards, Imperatrice called David Duffield, lieutenant of security at TropWorld, to the table, and Duffield, in turn, called Patrick Scully, TropWorld's sergeant of security, to come to the table. Plaintiff told Scully that he had been improperly paid and that he wanted to keep the cards as evidence. Scully told plaintiff that if he did not take his hands off the cards, he would be arrested. According to plaintiff, when he took his hands off the cards, Duffield came up from behind him and Duffield and Scully "marched" him off to the Commission booth. At that time, plaintiff was told by Duffield and Scully that he was under arrest.

When plaintiff arrived at the booth, he sat on the floor because he felt weak and lightheaded. Plaintiff spoke to Ronald Hungridge of the Division of Gaming Enforcement (DGE), who invited him to come to the DGE office. Hungridge, who described

plaintiff as "very upset, very boisterous," typed a complaint which Scully signed. Plaintiff was released after spending forty-five minutes to an hour at the DGE office. Plaintiff cashed his chips before he left the casino. He denied cursing at or threatening any of the casino personnel. A silent video tape of the incident, including the walk to the Commission's booth, is part of the record. There is no evidence on the tape that Tropworld's personnel manhandled or inappropriately placed their hands on plaintiff.

Plaintiff did not file a complaint with the Commission regarding this incident. After November 10, 1989, plaintiff did not go back to Tropworld to play blackjack because he believed he would be "arrested on sight." In addition, plaintiff testified that since that date he has not attempted to play blackjack "for serious money" in any other Atlantic City casino.

Imperatrice testified that on November 10, 1989, he was aware that plaintiff was a card counter. Imperatrice was watching plaintiff play when he noticed that plaintiff had a favorable count. As plaintiff began to take money out of his pocket, Imperatrice lowered the table's betting maximum to $100 by changing the sign and by orally informing plaintiff of the change. Imperatrice testified that he was "absolutely positive" that plaintiff's bet was not in the betting circle before he lowered the maximum bet.

After changing the maximum bet, Imperatrice asked if anyone would like to exceed the table maximum. Plaintiff responded that he intended to bet $300, and Imperatrice told him that he would win or lose $100. After plaintiff won the double down bet, Imperatrice instructed the dealer to pay plaintiff $200. At that point, according to Imperatrice, plaintiff "grabbed the cards off the table" and said that he wanted his money. He asked for a member of the Commission to come to the table, but was told that if he had a complaint he would have to take it to the Commission booth.

The dealer, Tu Nguyen, testified inconsistently as to whether plaintiff had money in the betting circle when Imperatrice

dropped the maximum bet. Nguyen also could not recall whether the other player at the table played the hand in question.

Victor Martinson, a floor person and member of Tropworld's card counting team in November 1989, conceded that had plaintiff not been at the table in question, the maximum bet would not have been lowered. Martinson added that because plaintiff was known to be a card counter, he would not have been granted permission to exceed the maximum after it had been lowered; however, such permission might have been granted to the other player at the table. In addition, Martinson testified that it was TropWorld's practice to raise the bet maximum back to its previous level after a card counter has left the table.

Defendants argue that plaintiff's cause of action for discrimination should have been dismissed because the Act does not create a private cause of action against a casino for discriminatory application of a Commission regulation. Defendants maintain that the trial court usurped the Commission's jurisdiction by arrogating to itself, and through the court to the jury, the power to interpret Commission regulations. Defendants also assert that the Commission had primary jurisdiction, and that, because plaintiff failed to address his complaints to the Commission, the trial court should have either referred the regulatory issues to the Commission or determined that plaintiff had failed to exhaust his administrative remedies.

Plaintiff responds that the discrimination claim was properly brought in court because he is not asserting "an implied right of a private action for breach of a gaming regulation," but rather is challenging the propriety of its implementation by TropWorld in relation to his common law right of access to the casinos, and because he does not have an adequate administrative remedy available to him based on the Commission's refusal to hold hearings on his various prior complaints.

With respect to the jurisdictional argument regarding plaintiff's discrimination claim, the trial court, in its published opinion deciding the summary judgment motions, addressed the question in

terms of whether plaintiff had exhausted his administrative remedies. The court concluded that any attempt on plaintiff's part to seek relief from the Commission would be futile because, in response to two previous letters, the Commission had informed plaintiff that a patron does not have the right to request a formal Commission hearing and that the Commission's review process does not provide any remedy for private patron complaints against casinos, and that since no final determination had been made by the Commission, there was nothing for the Appellate Division to review. *Campione, supra,* 274 *N.J.Super.* at 72–74, 643 *A.*2d 42. In addition, the trial court concluded that plaintiff was not challenging the validity of a Commission regulation, but rather the application of such regulations; consequently, the court held that the alleged discriminatory application of the regulations could be heard in Superior Court, particularly since the court had jurisdiction over plaintiff's other two causes of action—breach of contract and malicious prosecution. *Id.* at 74, 643 *A.*2d 42. The court further held that plaintiff had a private cause of action for damages:

> The case at bar ... does not involve a losing player asserting damages based on violation of casino regulations. Rather, it involves a player asserting that due to his card counting skills he has been denied equal access to the casino operation itself and that this is discrimination. It cannot be implied that because the Legislature did not create a specific private cause of action for card counters alleging discrimination that such a cause of action should be systematically barred.
>
> [*Id.* at 81–82, 643 *A.*2d 42.]

Thus, the court concluded that plaintiff was "entitled to those damages for which causation can be proved regarding discrimination in the implementation" of the Commission's regulations. *Id.* at 82, 643 *A.*2d 42.

We briefly address the trial court's determination that Tropworld is liable because it discriminates against a cardcounter. Two examples contained in the trial court's published opinion illustrate the "evil" perceived by the trial court. Tropworld limited plaintiff to playing one hand while permitting another gambler at the same table, who was not a card counter, to play two hands simultaneously. The trial court conceded that *N.J.A.C.*

19:47–2.14 grants a casino discretion "to permit a player to wager more than one box." *Id.* at 76, 643 *A.*2d 42. However, the court ruled that "it is discriminatory to allow others at the same table to play two hands, while limiting plaintiff to one. Such discrimination is prohibited." *Ibid.* We understand this ruling to be that if a casino applies an authorized countermeasure at a table, the countermeasure must be applied to all players at the table, including players who are not cardcounters.

The court seemingly applies this reasoning to the application of Tropworld's section 99 control giving it the discretion to permit a player to exceed a table's limit.

We have grave reservations regarding these rulings. The Commission adopted these measures to hobble cardcounters because of their perceived threat to the mathematical advantage the casino industry must enjoy to remain vital. *See* 14 *N.J.R.* 467–70 (5/17/82); 14 *N.J.R.* 559–69 (6/7/82); 14 *N.J.R.* 841 (8/2/82); 14 *N.J.R.* 991 (9/7/82). Thus, the Commission authorizes the disparate treatment of cardcounters. There is an anomaly, therefore, in any ruling that the disparate treatment of cardcounters is actionable. The anomaly is heightened by the trial court's ruling that the countermeasure, if imposed, must be imposed on all players at a table, thereby penalizing non-cardcounters.

■ We deem it unnecessary to go beyond these brief observations regarding plaintiff's discrimination claim because we are persuaded that his complaints regarding application of the countermeasures should not have been heard in the trial court. They are within the Commission's exclusive jurisdiction.

Some preliminary observations are in order. New Jersey's regulation of the casino industry is pervasive. As our Supreme Court has stated:

The statutory and administrative controls over casino operations established by the Act are extraordinary[ily] pervasive and intensive. Over 11 statutory articles and almost 200 separate provisions cover virtually every facet of casino gambling and its potential impact upon the public. The regulatory scheme is both comprehensive and minutely elaborate.

[*Knight v. City of Margate*, 86 *N.J.* 374, 380–81, 431 *A.*2d 833 (1981) (citation omitted).]

*Accord Uston, supra,* 89 *N.J.* at 168–69, 445 *A.*2d 370.

The Act gives the Commission responsibility for the Act's implementation, including the responsibility to "conduct all hearings pertaining to civil violations of this act or regulations promulgated hereunder," and to "receive[ ] complaints from the public." *N.J.S.A.* 5:12–63b and f. In addition, the Commission is authorized to impose a penalty on any licensee "for any cause deemed reasonable by the commission pursuant to rules and regulations promulgated." *N.J.S.A.* 5:12–64. The Commission also is authorized to order restitution of any money or property unlawfully obtained or retained by a licensee. *N.J.S.A.* 5:12–129(6). Any proceeding against a licensee must be brought by written complaint, setting forth the charges and the acts or omissions supporting such charges. *N.J.S.A.* 5:12–108a. Any person aggrieved by a final decision of the Commission made after a hearing may appeal to this court. *N.J.S.A.* 5:12–110a. The Act requires the Commission to promulgate regulations defining and limiting the rules of authorized games and the method of operation of such games. *N.J.S.A.* 5:12–70f.

In addition, the Act specifically provides: "The commission shall have exclusive jurisdiction over all matters delegated to it or within the scope of its powers under the provisions of this act." *N.J.S.A.* 5:12–133b. The Act does not contain any express provisions allowing a civil suit for damages by a casino customer based on violations of its regulatory provisions. *Miller v. Zoby,* 250 *N.J.Super.* 568, 573, 595 *A.*2d 1104 (App.Div.), *certif. denied,* 127 *N.J.* 553, 606 *A.*2d 366 (1991).

In *Miller,* the issue was whether a casino's violation of the credit extension provisions of the Act and the Commission's regulations, resulting in gambling losses to the plaintiff, created an implied private cause of action for damages in plaintiff's favor. *Id.* at 570, 595 *A.*2d 1104. We found no legislative intent in the Act authorizing a private cause of action for violations of the Act's

credit regulations. *Id.* at 570, 577, 595 *A.*2d 1104. We observed that "[t]he fact that no general cause of action for violation of the credit provisions of the Act has been created is to us some reliable evidence that the Legislature neither intended to create such a cause of action by silence nor desired the judiciary to create one by implication." *Id.* at 576, 595 *A.*2d 1104. We noted that there was no existing New Jersey tort or contract action analogous to the action brought by Miller, and that under New Jersey common law, a losing player could not recover his wager. *Id.* at 578, 595 *A.*2d 1104. We concluded:

> Given the pervasive casino regulatory scheme, we find no basis to authorize, as a matter of judge-made law, a new tort cause of action. The Legislature has provided only limited civil remedies in the Casino Control Act, see *N.J.S.A.* 5:12–101(f) and *N.J.S.A.* 5:12–127, and by implication we think no more than those established by the Act were intended.
>
> [*Id.* at 579–80, 595 *A.*2d 1104 (citation omitted).]

As stated above, we relied, in part, on the fact that the Legislature expressly granted jurisdiction to the Superior Court in two limited cases. *N.J.S.A.* 5:12–127 grants jurisdiction for injunctive relief, *N.J.S.A.* 5:12–127a and b, and for treble damages, *N.J.S.A.* 5:12–127c, for violation of *N.J.S.A.* 5:12–126, involving "conduct such as racketeering, loansharking, illegal infiltration of the industry, securities manipulation and cognate matters." *Miller, supra,* 250 *N.J.Super.* at 575, 595 *A.*2d 1104.

The other grant of jurisdiction referenced in *Miller* was *N.J.S.A.* 5:12–101f. It authorizes enforcement "in the courts of this State" of "checks cashed in conformity with the requirements of this act." It also renders unenforceable any check cashed in violation of the Act. *Miller, supra,* 250 *N.J.Super.* at 575, 595 *A.*2d 1104.

In *Decker v. Bally's Grand Hotel Casino,* 280 *N.J.Super.* 217, 222, 655 *A.*2d 73 (App.Div.1994), we rejected plaintiff's belated attempt to assert a cause of action against all the Atlantic City casinos based on the alleged failure to post appropriate notices regarding play at progressive slot machines. We ruled that the

Commission had exclusive jurisdiction over the alleged violation of *N.J.A.C.* 19:45–1.37(a)(9)(4)(iii), citing *N.J.S.A.* 5:12–63 and 133b.

In *Marcangelo v. Boardwalk Regency Corp.*, 847 *F.Supp.* 1222, 1223 (D.N.J.1994), plaintiff alleged that he had achieved a Royal Flush on a Pokermania machine. The casino refused to pay the highest prize because the plaintiff had not achieved the Royal Flush in the required sequence. Plaintiff sued the casino contending that the "signage on the face of the Pokermania machine was inadequate, in that it failed to give fair notice of the rules of the game." *Id.* at 1226. The casino contended that the Act preempted plaintiff's suit.

The court held that a private cause of action in favor of casino patrons may not be implied from the Act where the casino has complied fully with the applicable statutory and regulatory requirements. *Id.* at 1224. The court found that neither the Act nor the Commission's regulations expressly, or implicitly, provided for an action for inadequate signage. *Id.* at 1226–28. The case for an implied cause of action was weak, according to the court, because the casino had complied fully with the applicable statutory and regulatory requirements, including signage, and because the action dealt with gaming regulations at the heart of the Act. *Id.* at 1228. However, the court left open the question of whether such a cause of action could be implied where the signage had not been approved. *Ibid.* Nonetheless, the court noted that even if it were to find a common law cause of action for inadequate signage, such an action would be preempted by the exclusivity provision in *N.J.S.A.* 5:12–133b. *Id.* at 1229.

In the present case, plaintiff attacks Tropworld's application of Commission regulations regarding how blackjack is played. *See Uston, supra,* 89 *N.J.* at 169, 445 *A.*2d 370 (observing that "the Commission's regulation of blackjack is more extensive than the entire administrative regulation of many industries."). As previously indicated, *N.J.S.A.* 5:12–70f grants the Commission plenary authority to establish the rules of the game. It requires the Commission to adopt regulations "[d]efining and limiting the areas

of operation, the rules of authorized games, odds, and devices permitted, and the method of operation of such games and devices." *N.J.S.A.* 5:12–100e reinforces the Commission's authority in this respect, as it requires that

All gaming shall be conducted according to rules promulgated by the commission. All wagers and pay-offs of winning wagers shall be made according to rules promulgated by the commission, which shall establish such limitations as may be necessary to assure the vitality of casino operations and fair odds to casino patrons....

[*N.J.S.A.* 5:12–100e.]

This section has been described as "the heart" of the Act. *Uston, supra,* 89 *N.J.* at 168, 445 *A.*2d 370.

We are persuaded that the Act compels the *concentration* in the Commission of the power to define and regulate the manner in which games are played, and that this power extends to resolution of controversies regarding application and interpretation of the Commission's rules of play. Were it otherwise, the coherence and uniformity necessary to effect the legislative scheme of comprehensive control of the games by the Commission would be lacking. As the Supreme Court noted in *Uston,* "the Commission's control over the rules and conduct of licensed casino games is intended to be comprehensive." 89 *N.J.* at 169, 445 *A.*2d 370. Granting authority to trial courts and juries in twenty-one counties to interpret and apply game rules would be fatal to the legislative intent.

Plaintiff relies on *Greate Bay Hotel & Casino v. Tose,* 34 *F.*3d 1227 (3d Cir.1994), which involved a suit by a casino to enforce Leonard Tose's gambling debt. In his counterclaim, "Tose alleged that the [casino] intentionally and maliciously provided him with alcoholic beverages so that he would become intoxicated, continued to provide him with these beverages after he became visibly intoxicated, and encouraged and allowed him to gamble while visibly intoxicated." *Id.* at 1228–29. After two jury trials, judgment was entered in favor of the casino. Tose appealed. The casino cross-appealed from a pre-trial order denying its motion to

dismiss on the ground that the Act vested exclusive jurisdiction in the Commission to order repayment of gambling losses.

The Court of Appeals rejected the casino's jurisdiction argument, concluding that the Legislature did not vest exclusive primary jurisdiction in the Commission despite *N.J.S.A.* 5:12–133b. The Third Circuit based this conclusion on its determination that "a gambler seeking to recover his losses from a casino does not have an adequate administrative remedy." *Id.* at 1235. Ironically, in making that determination the Third Circuit relied on the published trial court opinion we now reverse.

We deem it unnecessary, however, to determine whether the Third Circuit correctly applied New Jersey law in *Tose,* where jurisdiction was based on diversity of citizenship. *Cf. Hakimoglu v. Trump Taj Mahal Assoc.,* 70 *F.*3d 291 (3d Cir.1995) (predicting that New Jersey Supreme Court would not permit gambler to recover losses allegedly caused by gambler's intoxication from alcoholic beverages freely supplied by casino). The distinction between *Tose* and the present case is obvious: *Tose* did not involve a claim based on the casino's application of the rules regulating the manner in which a game is played. As previously indicated, disputes regarding those rules and their application are within the exclusive jurisdiction of the Commission. The same distinction applies to *State v. Resorts Internat'l Hotel, Inc.,* 173 *N.J.Super.* 290, 414 *A.*2d 269 (App.Div.1980), *certif. denied,* 84 *N.J.* 466, 420 *A.*2d 1294 (1980), also relied on by plaintiff. We ruled there that the Act did not preempt New Jersey's Child Labor Laws.

As previously indicated, the trial court determined that there was no adequate administrative remedy. The court based its conclusion on the Commission's responses to complaints plaintiff had filed with the Commission. *Campione, supra,* 274 *N.J.Super.* at 72–74, 643 *A.*2d 42.

The record establishes that the Commission accepts gamblers' complaints and has promulgated a form titled "Patron Complaint Report." The report has spaces for the time and place of the

incident, complainant's version of the incident, and the relief requested, including the amount requested if monetary relief is sought. The record contains copies of several such reports filed by plaintiff with the Commission, and the record establishes that the Commission investigated and responded to plaintiff's reports.

We use as an example, plaintiff's complaint regarding an incident at the Claridge on May 6, 1988. The Commission responded by letter dated May 18, 1988:

> This is in response to your complaint filed with the Casino Control Commission (Commission) regarding an incident which occurred at Claridge Hotel Casino on May 6, 1988.
>
> Please be advised that the legal division of the Commission is presently collecting information relevant to this complaint. If you have any additional information or comments concerning this matter, kindly forward same in writing to the attention of the undersigned.
>
> Upon completion of the information gathering process, you will be apprised of our conclusions. Be advised that the Commission does not conduct hearings on individual patron complaints. Rather, efforts are made to resolve such matters informally where possible. In addition, all complaints filed against a casino will be reviewed in connection with the annual renewal of its casino license to determine whether it is providing the type of entertainment and services envisioned by the Legislature when it adopted the Casino Control Act. *N.J.S.A.* 5:12–1 *et seq.* Furthermore, you should be aware that, because of the large number of patron complaints filed with the Commission, our response may be delayed.

Thereafter, the Claridge sent a report to the Commission dated July 14, 1988, responding to plaintiff's complaint. The Commission rejected plaintiff's complaint in a letter dated July 27, 1988. The Commission informed plaintiff:

> The Commission's legal division has reviewed your complaint. Based upon that review, it is our position that your complaint does not indicate any violation of the Casino Control Act or pertinent regulations.
>
> Because we find no violation of the Act or the regulations, the dispute contained in your complaint is a private matter between you and Claridge Hotel Casino. Nevertheless, you may wish to consult an attorney who may advise you of other courses of action to pursue.

Plaintiff and the trial court also relied on a Commission letter to plaintiff dated February 23, 1989, regarding an incident at Caesars' casino. The Commission's representative stated in part:

> The Commission does not conduct formal hearings on patron complaints. Rather, the Commission staff attempts to resolve such matters informally by collecting

pertinent information and evaluating the situation to determine whether any licensee under the Casino Control Act violated any provisions of the Act or the attendant rules and regulations adopted by the Commission. If a violation is involved, the matter is referred to the Division of Gaming Enforcement (DGE) which may, in its discretion, file a formal complaint that will be adjudicated by the Commission. Patron complaints which do not result in formal DGE complaints are reviewed by the Commission in connection with periodic license renewal proceedings.

This process is not designed to provide patrons with a forum for redress against casinos. The Commission is without authority to compel casino licensees to pay money damages to patrons, even in instances where a violation occurred. That authority rests with the courts of the State of New Jersey. Nevertheless, as part of the informal information gathering process, casino licensees occasionally offer some form of recompense to the patron on a voluntary basis. However, that decision rests exclusively within the discretion of the casino involved.

The legal division of the Commission is presently collecting information relevant to this complaint. If you have any additional information or comments concerning this matter, kindly forward same in writing to me at the address on the center of the letterhead. You will be advised of the results of our informal investigation. However, due to the volume of complaints our response may be delayed. Your patience and cooperation is appreciated.

The Commission is not a party to this appeal, and has not participated as an *amicus*. We are reluctant, therefore, to go beyond the following general observations regarding the Commission's powers and obligations.

■ The Commission's letters suggest that the Commission's view of its role and authority is too limited. The Commission does have the power to award money. *N.J.S.A.* 5:12–129(6) authorizes the Commission to "[o]rder restitution of any moneys ... unlawfully obtained or retained by a licensee or registrant[.]" It is likely that this section authorizes the Commission to order a licensee to return a patron's bet if it was collected in violation of the Commission's rules. It may also include the power to make a patron whole by ordering payment to a patron as if the bet had been won.

As previously indicated, the Act requires the Commission to "conduct all hearings pertaining to civil violations of" the Act, *N.J.S.A.* 5:12–63b, and to receive "complaints from the public relating to the conduct of gaming." *N.J.S.A.* 5:12–63f. The Commission's use of the Patron Complaint Report, and the Com-

mission's response to plaintiff's complaints demonstrate that the Commission is aware of its responsibility in this regard and is fulfilling it. Although the Commission did not afford plaintiff a trial-type hearing regarding his complaint, it may be that plaintiff was not entitled to one considering the nature and circumstances of his allegations. *See Bally Mfg. Corp. v. N.J. Casino Control Comm'n*, 85 *N.J.* 325, 333, 426 *A.*2d 1000 (1981) (holding that evidentiary hearing not necessary where proposed administrative action is based on undisputed material facts). Moreover, in the event of a factual dispute regarding application of the game rules, in many cases the dispute could be resolved by reference to the video tapes made by the casino's surveillance cameras.

For the reasons stated above we hold: (1) there is no private cause of action against a casino for its alleged violation of Commission regulations governing the manner in which games are played; (2) the Commission has exclusive jurisdiction over claims that a casino has violated the rules of play; (3) the Commission has the power to make a patron whole by ordering restitution.

Accordingly, the judgment awarding plaintiff damages for the casino's alleged discriminatory treatment of him, and for the casino's refusal to pay plaintiff based on two $350 bets rather than on two $100 bets, are reversed. Reversal is without prejudice to plaintiff's submission of those complaints to the Commission, within sixty days.

## II. *MALICIOUS PROSECUTION*

As stated above, casino security personnel charged plaintiff with two petty disorderly persons offenses. The first count charged that plaintiff "became disorderly by causing an annoyance and disrupting the game of Blackjack by retaining the playing cards and threatening Tropworld Employees" in violation of *N.J.S.A.* 2C:33–2(a).

The second count charged that plaintiff did "knowingly commit an act of criminal trespass by remaining in the casino complex after being formally rejected from same" in violation of *N.J.S.A.*

2C:18–3. This count is based on the defiant trespasser section of the criminal trespass statute. *N.J.S.A.* 2C:18–3b; *cf. State v. Slobin,* 294 *N.J.Super.* 154, 682 *A.*2d 1205 (App.Div.1996) (affirming conviction of disruptive blackjack patron as a defiant trespasser).

The charges were tried in the Atlantic City Municipal Court. At the conclusion of the State's case, the judge dismissed the first count on the grounds that plaintiff was not causing a public annoyance or intended to do so. Thereafter, plaintiff testified in his defense on the defiant trespassing count. The court found him not guilty because plaintiff was "legitimately trying to protect his bet."

 The Law Division had jurisdiction to determine the malicious prosecution claim, but the jury's verdict on that claim cannot stand. In its instructions regarding the discrimination claim, the trial court informed the jury that if Tropworld had required plaintiff to play under rules different from the rules applied to other players at the same table, then Tropworld had illegally discriminated against plaintiff. As indicated, defendants did not deny that they had applied countermeasures only to plaintiff. Thus, the instruction in effect told the jury that defendants had been guilty of invidious discrimination. We are persuaded that the jury's consideration of the discrimination claim in the context of this instruction had the capacity to prejudice Tropworld with regard to the malicious prosecution claim.

We are also persuaded that the court's instruction regarding malicious prosecution had the capacity to produce an unjust result. After explaining the elements of malicious prosecution and the elements of defiant trespassing, the court also instructed the jury regarding the affirmative defenses to defiant trespassing. *N.J.S.A.* 2C:18–3c. Those affirmative defenses include *N.J.S.A.* 2C:18–3c(2) which provides that it is a defense if the structure "was ... open to members of the public and the actor complied with all lawful conditions imposed on access to or remaining in the structure." The instruction, however, did not relate this defense to the facts of the case. There was no explanation of what

constituted "lawful conditions imposed on access to or remaining in the structure." Thus, there was no explanation of the fact that casino management may, under certain circumstances, lawfully require a person to leave the premises though a casino is otherwise "open to members of the public." Indeed, the entire instruction regarding the malicious prosecution claim was delivered in the abstract and failed to relate those legal principles to the evidence in the case and the factual contentions of the parties.

Although we reverse the malicious prosecution liability and damages verdict on the grounds stated above, we deem it helpful, nevertheless, to review the evidence and the law applicable to that claim for the benefit of the Law Division on remand.

 A malicious prosecution action arising out of a criminal complaint requires proof that the defendant instituted a criminal action against the plaintiff, that defendant was actuated by malice, that there was an absence of probable cause for the criminal complaint, and that it was terminated favorably to the plaintiff. *Lind v. Schmid,* 67 *N.J.* 255, 262, 337 *A.2d* 365 (1975). The plaintiff must establish each element, or the cause of action will fail. *Ibid.* "Upon failure to prove any one, the cause must fail." *Ibid.* Moreover, malicious prosecution is not a favored cause of action because it may unduly deter citizens from the prosecution of those reasonably suspected of crime. *Ibid.*

 Here, there is no dispute that the criminal action was instituted by defendants and that it was terminated favorably in plaintiff's favor. The issue is whether there was probable cause for the criminal proceeding because "[t]he essence of the cause of action is lack of probable cause, and the burden of proof rests on the plaintiff." *Lind, supra,* 67 *N.J.* at 262, 337 *A.2d* 365. Probable cause must be measured by the objective standard of the perceptions of a reasonable and prudent person in like circumstances. *Carollo v. Supermarkets Gen. Corp.,* 251 *N.J.Super.* 264, 270, 597 *A.2d* 1105 (App.Div.1991), *certif. denied,* 127 *N.J.* 559, 606 *A.2d* 371 (1992). The fact of a favorable termination sheds no light on the existence of probable cause at the time of the initial

complaint; the burden remains on the plaintiff to demonstrate by independent proof that the criminal complaint was filed without probable cause. *Rubin v. Nowak,* 248 *N.J.Super.* 80, 85, 590 *A.*2d 249 (App.Div.1991).

In the Law Division, Scully testified that when he first arrived at the table, plaintiff had "physical control of the cards." The video tape corroborates that fact. Scully testified that he told plaintiff two or three times that if he did not give up the cards he would be arrested. When plaintiff relinquished the cards, he was told to leave the game, but refused and said that he would have to be "physically taken off the game." At that point, according to Scully, Duffield told plaintiff that he was ejected and that if he did not leave he would be arrested. Scully believed that plaintiff was challenging and threatening the casino's security personnel by his statement that the personnel would have to physically remove him. According to Scully, after plaintiff was taken to the Commission booth, he sat down on the floor and refused to move. The video tape corroborates this fact. Scully claimed that plaintiff directed abusive language towards him throughout the incident.

Scully testified that in November 1989 he was familiar with the New Jersey Criminal Code. He explained that he understood "probable cause" to mean that there is enough information about a particular incident to believe that someone has committed a crime and to detain that individual in order to make an arrest. In addition, Scully testified that before he would sign a complaint against someone he would have to believe that they committed a crime. He stated that he signed a complaint against plaintiff because he believed plaintiff committed defiant trespass and disorderly conduct. Specifically, the complaint signed by Scully charged plaintiff with disorderly conduct "by causing annoyance and disrupting the game of blackjack by retaining the playing cards and threatening TropWorld employees," and with trespass by remaining in the casino complex after being formally ejected.

The standard for evaluating whether probable cause exists in the context of a malicious prosecution action was formulated some eighty years ago:

> Where the question whether or not the defendant had probable cause for instituting the prosecution against the plaintiff depends, in part, at least, upon facts the existence of which are in dispute, it is the function of the jury to settle those facts, and, upon doing so, to determine on the whole case whether or not probable cause has been shown; such determination being based upon proper instructions submitted by the trial court. But where the facts are not controverted the question of probable cause is one of law to be determined by the court, and its submission to the jury is improper.
>
> [*Vladar v. Klopman,* 89 *N.J.L.* 575, 578, 99 *A.* 330 (E. & A.1916) (citations omitted).]

This court recently has noted that the factual disputes must be essential to the determination of probable cause:

> [A] jury has no function to perform with reference to the issue of probable cause unless there is a conflict in the testimony *as to the circumstances under which the defendant acted in initiating the proceedings.* If these circumstances are admitted by either party or if the evidence upon them is clear and uncontradicted, there is no need for a finding of the jury to give the court information upon which to determine the existence or nonexistence of probable cause.
>
> [*Paul v. National Educ. Ass'n,* 195 *N.J.Super.* 426, 429, 480 *A.2d* 213 (App.Div. 1984) (citing *Restatement (Second) of Torts,* § 673 (1977)) (emphasis added).]

In *Paul, supra,* 195 *N.J.Super.* at 429–30, 480 *A.2d* 213, we upheld the trial court's grant of summary judgment dismissing the malicious prosecution action even though the record demonstrated, according to the court, "some factual differences which might well impact on the question of probable cause" because those facts were not viewed by the court, in the summary judgment terminology, as material.

We have engaged in this review of the evidence and law applicable to the malicious prosecution claim because the case was tried before our Supreme Court decided *Brill v. Guardian Life Ins. Co. of America,* 142 *N.J.* 520, 666 *A.2d* 146 (1995). In *Brill,* the Supreme Court modified our traditional approach to summary judgment analysis and eased the stringent requirements of that analysis in favor of the moving party. Under *Brill,* "the essence of the inquiry ... is ... 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id.* at 536, 666 *A.2d* 146 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 *U.S.* 242, 251–52, 106 *S.Ct.* 2505, 2512, 91 *L. Ed.2d* 202, 214 (1986)).

The Court also announced that "[t]he rule we adopt today shall apply to this case and all cases pending in the trial and appellate courts involving unresolved issues concerning summary judgment, including those cases in which summary judgment was denied previously." *Id.* at 545–46, 666 *A.*2d 146.

Although we remand for a new trial on the malicious prosecution claim, it is without prejudice to a motion by defendants for summary judgment, which the trial court shall consider under the *Brill* standards.

The judgments are reversed and the case is remanded for further proceedings. Plaintiff's cross-appeal is dismissed as moot.[1]

---

[1] Plaintiff passed away while this appeal was pending. On remand, an application for substitution must be made pursuant to *R.* 4:34–1(b).