726 A.2d 262 (1999)
319 N.J. Super. 556
Jacquelyn MYRICK, Plaintiff-Appellant,
v.
RESORTS INTERNATIONAL CASINO & HOTEL, David Chan, Midlantic National Bank, and Louanne Altbaum, Defendants-Respondents, and
Detective W. Schulte, and Merv Griffin, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued January 19, 1999.
Decided March 22, 1999.
*264 Albert J. Brooks, Jr., Philadelphia, PA, for plaintiff-appellant (Sheller, Ludwig & Badey, attorneys, Mr. Brooks, on the brief).
John M. Donnelly, Atlantic City, for defendants-respondents Resorts International Casino & Hotel and David Chan (Levine, Staller, Sklar, Chan, Brodsky & Donnelly, attorneys; Mr. Donnelly and E. Allan Mack, on the brief).
Michael K. Tuzzio, for defendants-respondents Midlantic National Bank and Louanne Altbaum (Ronan, Tuzzio & Giannone, attorneys; Mr. Tuzzio, Tinton Falls, and Anthony M. Tracy, on the brief).
Before Judges HAVEY, SKILLMAN and PAUL G. LEVY.
*263 The opinion of the court was delivered by PAUL G. LEVY, J.A.D.
On April 12, 1993, while an employee of defendant Resorts International Casino Hotel, plaintiff Jacquelyn Myrick was mistakenly given the paycheck of another employee, Jacqueline Hill. According to plaintiff, she did not see that she had received the wrong check and was unaware that her own paycheck was for a greater amount. She proceeded to cash it by presenting it to a teller at an office of defendant Midlantic National Bank. The check had been drawn on another bank, and that bank returned the check to Midlantic due to a stop payment order. Midlantic advised Resorts of the error, and Resorts turned the matter over to the Division of Gaming Enforcement (DGE). The DGE investigated, identified plaintiff and learned of her role in the incident. The DGE caused plaintiff's arrest and subsequently filed criminal charges against her in the municipal court for theft of movable property worth $349.48, a fourth degree crime. N.J.S.A. 2C:20-3. The casino suspended plaintiff and filed a complaint with the Casino Control Commission, asking for revocation of her casino employee license and registration.
Both the criminal and the administrative matters were resolved in plaintiff's favor, but she was discharged from her employment with Resorts; it has refused to reinstate her, and she claims she is unable to find other employment in the casino industry. She brought a multi-count complaint and eventually was left with a claim for malicious prosecution against Resorts and its employee David Chan (the casino defendants) and claims for malicious prosecution and tortious interference with her employment contract against Midlantic and its employee Luann Altbaum (the bank defendants). The casino defendants and the bank defendants filed separate motions for summary judgment and the trial judge granted each motion, effectively dismissing the complaint as to all defendants. Plaintiff appeals, but we affirm.
The relevant facts are not disputed. Plaintiff worked as a blackjack dealer, and she was paid an hourly wage plus a portion of tips collected. Paychecks were customarily delivered to dealers in the casino by another employee who would look at the dealer's name tag (which contained only the first name) and then retrieve the check from a box and hand it to the dealer. On this particular occasion, plaintiff was mistakenly given the paycheck of Jacqueline Hill by an employee she did not know, but recognized. She claimed that she followed her usual routine and placed the check in her pocket without examining it closely. Because she received different amounts each week and did not maintain a bank account, she drove to a local branch of Midlantic Bank, as she usually did, and cashed her check by showing her casino employee's identification documents to the teller. After Louanne Altbaum, the teller, *265 received the check and identification from plaintiff, she asked whether plaintiff was married. Plaintiff testified at deposition that she told Altbaum that she was divorced and asked why Altbaum wanted to know that information. Altbaum never responded to plaintiff's question. The amount of the cashed check was $349.48.
Altbaum was notified sometime after plaintiff had cashed the check that an order to stop payment had been placed on it because it had been reported as lost or stolen. At the time of the transaction, Altbaum was not aware of the stop payment order because the paycheck was not drawn against a Midlantic account. Under the guidance of an assistant bank manager, Altbaum wrote a letter to Resorts in an effort to recoup the money. She explained in the letter that she was trying to locate Hill, who also may have been known as Jacqueline Myers, the name Altbaum believed had been endorsed on the check. She also asserted in her deposition that she had asked the name of the person who had presented the check why there was a different last name, and the person replied that it was due to a recent marriage. Altbaum informed Resorts that a stop payment had been placed against the check, as the check was reported "either lost or stolen." She requested Resorts' assistance in helping her recover the money from "Jacqueline." Finally, Altbaum asked for confirmation that Jacqueline Hill and Jacqueline Myers are the same person, and if not, whether Resorts had any information about Jacqueline Myers.
Upon receipt of the letter, Resorts contacted the DGE, and Detective Schulte undertook an investigation. He deduced that plaintiff was the person who had cashed the check, based on her identification number on it. Later, when she returned from a vacation, he and two other investigators interviewed her. According to the investigative report, when they confronted her with what they knew, she admitted that her signature was on Hill's check but stated that she did not realize the check belonged to Hill. She denied having a conversation with Altbaum about her recent marriage and could not explain: (1) why she did not realize that Hill's name, not hers, was the named payee of the check, or (2) why Hill's check was for $65 less than her own. At this point, plaintiff was arrested for "unlawfully taking certain movable property" in violation of N.J.S.A. 2C:20-3 and released on her own recognizance.
Plaintiff's version of what transpired during the interrogation is slightly different. She claimed there were five men in the room, all of whom were yelling at her, accusing her of stealing the check and telling her that she must admit to doing so. She tried to explain the absurdity of such a theory given the fact that she signed her name and placed her Casino Control Commission identification number on the back of the check. Plaintiff admitted that the endorsement on Hill's check looked like her signature, though she was not sure.
After plaintiff was fingerprinted, she was escorted to the employee locker room so that she could remove her personal property. Defendant Chan, a Resorts shift manager and plaintiff's supervisor, gave her a written notice of suspension. On May 26, 1993, plaintiff was discharged for "Rules of Conduct," which she believed meant stealing another employee's property.
Schulte's investigation was summarized in a report dated May 10, 1993. Among other things, the report stated that on April 30, 1993, plaintiff had "inquired about her April 12, 1993 check and said she did not receive her check." Plaintiff testified at her deposition that this was not true. She suggested that she had been set up by Resorts, and she did not ask about her April 12 check. Rather, she may have asked about her "vacation check."
The criminal charges against her were administratively dismissed on July 30, 1993. In addition, on August 17, 1993, the Casino Control Commission informed plaintiff that it had denied Resorts' application to have her casino employee license and registration suspended. Nonetheless, Resorts refused to reinstate her.

I. Malicious Prosecution by the Casino Defendants
On the motion for summary judgment, the judge was primarily concerned with "whether *266 or not the action of Resorts was activated by malice and whether or not there was probable cause to take the action which they took." He noted that probable cause is analyzed under the objective standard of "what would a reasonably prudent person do under these facts and circumstances." For purposes of the motion, the judge accepted as true plaintiff's assertion that she never attempted to pick up her check, and he summarized the claim against the casino defendants as follows:
[T]his check was endorsed by Myrick with her name, that she put her number on it, her casino control number on it, and it was all a big mistake. And, therefore they must have had malice against her or they wouldn't have taken the action that they took.
Malicious prosecution was thoroughly explained in Lind v. Schmid, 67 N.J. 255, 337 A.2d 365 (1975):
[M]alicious prosecution is not a favored cause of action because citizens should not be inhibited in instituting prosecution of those reasonably suspected of crime. On the other hand, one who recklessly institutes criminal proceedings without any reasonable basis should be responsible for such irresponsible action. Development of the malicious prosecution cause of action as we know it today is the result of a balancing of these antithetical considerations.
A malicious prosecution action arising out of a criminal prosecution requires proof: (1) that the criminal action was instituted by the defendant against the plaintiff, (2) that it was actuated by malice, (3) that there was an absence of probable cause for the proceeding, and (4) that it was terminated favorably to the plaintiff. The plaintiff must establish each element. Upon failure to prove any one, the cause must fail. Each element is separable from the others, although evidence of one may be relevant with respect to another. For example, proof of lack of probable cause may be appropriate evidence from which to infer but not necessarily establish malice.
The essence of the cause of action is lack of probable cause, and the burden of proof rests on the plaintiff. The plaintiff must establish a negative, namely, that probable cause did not exist.
[Id. at 262-63, 337 A.2d 365 (citations omitted).]
The casino defendants argued that plaintiff had failed to establish that the criminal complaint was actuated by malice and that there was no probable cause. The essence of the inquiry on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536, 666 A.2d 146 (1995)(quotation omitted). We conclude here that the evidence is "so one-sided" that the casino defendants were entitled to summary judgment as a matter of law on the claim for malicious prosecution.
First, although not relied on by the motion judge as a ground of decision, we conclude that the casino defendants did not institute the prosecution of the defendant.[1]MacLaughlin v. Lehigh Valley R.R. Co., 93 N.J.L. 263, 108 A. 309 (Sup.Ct.1919), held that a company reporting suspected criminal activity to the authorities cannot be liable for malicious prosecution when the authorities decide to prosecute the suspected criminals. There, the defendant railroad company's security personnel saw some individuals break into and steal some rolls of leather from one of its rail cars. Id. at 264, 108 A. 309. The security guards called the Jersey City police and, based on their descriptions of the individuals involved, the police arrested plaintiff, who was then identified by the guards. Ibid. Ultimately, the prosecutor dismissed the indictment because the security guards had moved and were unavailable to testify. Id. at 264-65, 108 A. 309.
The plaintiff then instituted a malicious prosecution action against the railroad company *267 and recovered a judgment after a jury trial. On appeal, it was held that the police, but not the defendant, had instituted the prosecution. The court explained:
The defendant company's two detectives reported the robbery to police headquarters at Jersey City, and described the occurrence to the officer in charge; he, thereupon, acting as the representative of one of the departments of the city government, and not at all as the agent of the defendant company, caused the arrest of the plaintiff and his confinement in prison. It appears that the complaint then made against the plaintiff was made by a member of the city police force, and there is nothing in the case to show that the defendant was responsible for the making of that complaint.

[Id. at 267, 108 A. 309.]
The DGE is a division of the Department of Law and Public Safety and is clearly not an agent of the casino. Moreover, it was from the official investigation that facts were revealed that enabled the DGE to identify plaintiff and deduce her role in the incident; the DGE arrested her on its own. Thus, unlike the security guards in MacLaughlin, the casino did not even tell the DGE that plaintiff (or anyone else for that matter) had stolen Hill's paycheck. Instead, the casino merely passed along the Altbaum letter requesting assistance in locating Hill or Myers, whom Altbaum believed was the endorser of the paycheck that she had wrongfully cashed over a stop payment.
It is clear to us that the casino defendants did not "put the proceedings in motion," Lind, supra, 67 N.J. at 263, 337 A.2d 365 (emphasis in original), when they called in the DGE to investigate the incident reported in the Altbaum letter. The casino defendants were not aware of plaintiff's involvement at the time, and, as in MacLaughlin, it was the DGEnot the casino defendantsthat concluded that plaintiff was involved. There is no doubt that it was the DGE that made the decision to arrest plaintiff. Pursuant to MacLaughlin, therefore, the casino defendants cannot be said to have instituted the prosecution of plaintiff.
Even if the call to the DGE may be considered to be the institution of criminal proceedings, we do not accept plaintiff's contention that there was no probable cause to contact the DGE. The DGE was called after the casino received Altbaum's letter, which enclosed Hill's paycheck and the stop notice and advised that a paycheck issued to Hill and reported lost or stolen had been cashed by someone believed to be named Jacqueline Myers. Certainly, at this point, "the perceptions of a reasonable and prudent person in like circumstances," Campione v. Adamar of New Jersey, Inc., 302 N.J.Super. 99, 120, 694 A.2d 1045 (App.Div.1997), would have resulted in some kind of investigation.
The Casino Control Act provides:
All licensees ... shall have a duty to inform the commission or division of any action which they believe would constitute a violation of this act.

[N.J.S.A. 5:12-80(g).]
It is a violation of the Casino Control Act for an individual casino licensee to commit an act of theft, in any degree, whether the licensee is ultimately convicted or not. N.J.S.A. 5:12-86(g); State of New Jersey, Dept. of Law and Public Safety, Div. of Gaming Enforcement v. Diglio, 94 N.J.A.R.2d (CCC) 15, 1992 WL 566157 (1992). Even though the Casino defendants did not know of plaintiff's involvement at that point, the allegedly lost or stolen paycheck did belong to one of its employees and, therefore, the possibility existed that the Casino Control Act might have been violated. Furthermore, even if the casino defendants knew, or should have known of plaintiff's involvement, they certainly would have been required to report the incident to the DGE for investigation.
Finally, plaintiff did not show that the casino defendants acted with malice in contacting the DGE. Putting aside any claim that plaintiff attempted to obtain her own paycheck after cashing Hill's, the evidence "as to the circumstances under which the [casino defendants] acted in initiating the proceedings," Campione, supra, 302 N.J.Super. at 122, 694 A.2d 1045 (citation omitted)(emphasis removed), was undisputed. Hill did not receive her paycheck, which had a stop notice issued against it because it was *268 reported as lost or stolen. Despite the stop notice, the paycheck was cashed. The casino defendants reported this information to the DGE for investigation at a point in time when they were unaware of plaintiff's involvement. Therefore, they could not have had any malice toward her in doing so.
Therefore, given the Supreme Court's position that "malicious prosecution is not a favored cause of action," Lind, supra, 67 N.J. at 262, 337 A.2d 365, the casino defendants' contact with DGE upon receipt of Altbaum's letter was not the initiation of the criminal proceedings against plaintiff. In addition, plaintiff failed to present evidence from which a trier of fact could find that (1) the casino defendants lacked probable cause to contact the DGE, or that (2) the asserted lack of probable cause establishes malice on their part.

II. Malicious Prosecution by the Bank Defendants
Plaintiff contends it was error to grant summary judgment to the bank defendants concerning her claim of malicious prosecution, because those defendants need only have been the "proximate and efficient cause of maliciously putting the law in motion," citing Seidel v. Greenberg, 108 N.J.Super. 248, 258, 260 A.2d 863 (Law Div. 1969)(quotation omitted)(emphasis removed). In Seidel, however, it was the defendants' crimes that led to an investigation and eventual criminal prosecution of plaintiff. Thus, that court held that "defendants are liable to plaintiff because his wrongful prosecution was proximately caused by the wrongful criminal acts for which they were convicted." Id. at 269-70, 260 A.2d 863. We reject that "but for" theory of proximate cause here.
As previously discussed, the casino defendants cannot be considered to have put the law in motion. Certainly, then, the bank defendants, who are one step removed from the casino defendants, could not be considered to have done so either. Indeed, the bank defendants were merely exploring the possible recoupment of their monies, which had been paid as a result of Altbaum's mistake in judgment. There was no indication in Altbaum's letter that Midlantic was considering pressing criminal charges against anyone. The judge specifically determined that the bank defendants did not initiate any prosecution, and we agree with that decision.
Plaintiff has also failed to prove that the bank defendants acted with malice by sending the Altbaum letter to Resorts. She contends the letter was self-serving and malicious in that it contained false information about the circumstances of the check cashing incident. However, it is undisputed that the letter contained the truth on the relevant issue: Hill's paycheck, which had been reported as lost or stolen, had been cashed at Midlantic. There is nothing malicious or false about the statement itself or about making it. Altbaum simply wanted to recover the money that Midlantic wrongfully gave to plaintiff. Moreover, even if Altbaum lied about plaintiff's representation as to her marital status, the fact remains that Altbaum did not lie about the relevant fact, that the bank defendants had erroneously cashed Hill's lost or stolen paycheck.
Additionally, given that plaintiff's casino identification number was endorsed on the check made out to another person, the bank also had probable cause to ask the casino for assistance in ascertaining the identity of the person to whom that number was assigned.
Therefore, based on the undisputed facts, the evidence was so one-sided that the bank defendants were entitled to summary judgment as a matter of law on plaintiff's malicious prosecution claim, because they did not institute criminal proceedings against plaintiff, and because no reasonable jury could conclude they either lacked probable cause or acted with malice when Altbaum wrote the letter to Resorts. Brill, supra, 142 N.J. at 536, 666 A.2d 146.

III. Tortious Interference by the Bank Defendants
A claim for tortious interference with the performance of a contract must be based, in part, on "facts claiming that the interference was done intentionally and with `malice.' ... For purposes of this tort, `[t]he term malice is not used in the literal sense *269 requiring ill will toward plaintiff.' ... Rather, malice is defined to mean that the harm was inflicted intentionally and without justification or excuse." Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 751, 563 A.2d 31 (1989) (citations omitted). Plaintiff contends this claim is sustainable because she established that the bank defendants' conduct was the proximate cause of her termination of employment by Resorts and that they acted with malice in accusing her of stealing Hill's paycheck, evidenced by Altbaum's ulterior motives and lies. We have already discussed and rejected these allegations. Thus we conclude that this last contention lacks merit and requires no further discussion. R. 2:11-3(e)(1)(E).
Affirmed.
NOTES
[1] The only mention of this issue, as it affected the casino defendants, was the judge's statement that as a result of the wrong person cashing the check, "the matter was reported to the Casino Control Commission. Action was taken. As far as the arrest is concerned, Resorts had nothing to do with that. That was done by the officer."