DOUG GRANT, INC., et al., Plaintiffs.

v.

GREATE BAY CASINO CORP.,
et al., Defendants.

No. CIV. A. 97–4291, (JEI).

United States District Court,
D. New Jersey.

May 1, 1998.

Howard A. Altschuler, Haworth, NJ, for Doug Grant, Inc., et al.

Barry & McMoran by Adam N. Saravay, John J. Barry, Newark, NJ, for Trump Casino, All Other Casino Defendants, Griffin Investigations.

Levine, Staller, Sklar, Chan, Brodsky & Donnelly, P.A. by John M. Donnelly, Atlantic City, NJ, for Casino Defendants (other than Trump Casino), Griffin Investigations.

Madden, Madden & Del Duca, by Damien O. Del Duca, Patrick J. Madden, Haddonfield, NJ, for F. Michael Daily, Ellen Barney Balint, Quinne, Dunne, Daily and Higgins, P.A.

Kelley, Wardell & Craig, LLP by John T. Kelley, Haddonfield, NJ, for Meranze & Katz.

Sterns & Weinroth, P.C. by Michael L. Rosenberg, Bart Q. Hollander, Trenton, NJ, for Caplan & Luber, Lloyd S. Markind, Richard L. Caplan, Sharon Morgan, Michele Davis.

## OPINION

IRENAS, District Judge.

Plaintiffs, who are primarily card-counting blackjack players, bring this action against

thirty-eight casino defendants ("Casino Defendants"), three investigation agencies, and several hundred "John Doe" defendants, alleging a conspiracy in violation of state and federal RICO statutes, and violations of the New Jersey Public Accommodations Act and the New Jersey Consumer Fraud Act. In addition, they assert constitutional and civil rights claims implicating the Equal Protection Clause, the Due Process Clause, Article 1, paragraph 1 of the New Jersey Constitution, 42 U.S.C. § 1983 and other state and federal statutes, and various common law claims for breach of contract, fraud, tortious interference with contract and prospective economic advantage, and negligence. The complaint also asserts an assortment of personal injury claims. including invasions of privacy, misappropriation of name or likeness, libel, slander, and infliction of emotional distress. Finally, plaintiffs assert claims against nine lawyer and law firm defendants ("Lawyer Defendants") for legal malpractice, breach of fiduciary duty, negligence, breach of contract, and negligent supervision.[1] Jurisdiction over plaintiffs' federal statutory and constitutional claims is premised upon 28 U.S.C. § 1331. Jurisdiction over plaintiffs' remaining claims is based upon the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

Currently before the Court are motions by all of the defendants to dismiss the plaintiffs' complaint pursuant to Fed.R.Civ.P. 12(b)(6). The defendants are also in the process of filing a motion for Rule 11 sanctions, Fed.R.Civ.P. 11, against plaintiffs' attorney and the lead plaintiff, Doug Grant von Reiman ("Doug Grant"), who claims to act as attorney-in-fact for the plaintiffs. We will reserve all issues relating to the Rule 11 sanctions for consideration at a later date. For the reasons that follow, we will grant the defendants' motions to dismiss under Fed.R.Civ.P. 12(b)(6) as to the First Count, Second Count, Third Count, Fifth Count, Sixth Count, Seventh Count and Thirteenth Count. These counts are all based on the plaintiffs' central allegation that the casinos' implementation of Casino Control Commission ("CCC") regulations violates various federal and state statutes, the common law, and the United States and New Jersey Constitutions. After dismissing all these federal and related claims based on the CCC regulations, we decline to retain subject matter jurisdiction over the remaining state law claims alleged in the Eighth, Ninth, Tenth and Eleventh Counts and the state law malpractice claims against the Lawyer Defendants. Because these claims do not form part of the same case or controversy as the CCC regulation claims and because, in any case, we have discretion to decline to exercise supplemental jurisdiction, we will remand them to state court. As plaintiffs have withdrawn their claims under the Fourth and Eleventh Counts, we will also dismiss these claims.

## I. BACKGROUND

The individual plaintiffs in this matter are blackjack players who frequent the Atlantic City casinos operated by the Casino Defen-

---

1. In addition to these broad and dramatic allegations, the complaint also reels back and forth, bursting at the seams, in its requests for damages and relief. In just *one* count, the complaint makes a prayer for: compensatory and consequential damages; punitive damages; injunctive remedies; treble damages; interest; costs of suit; attorneys' fees; the dissolution or reorganization of the alleged casino enterprise; the revocation of the charter of corporate defendants organized under the laws of the State of New Jersey; the denial, suspension or revocation of the license of any foreign corporation; the denial, suspension or revocation of the license or permit granted to any casino by any department or agency of the State of New Jersey; a cease and desist order which specifies the acts and conduct which are to be discontinued, altered or implemented; the "restitution of all moneys or property unlawfully obtained or retained by defendants ..., including but not limited to the return of all bets placed by the plaintiffs, as well as the winnings plaintiffs would have realized for each bet had plaintiffs won the maximum payout available per bet;" and an assessment of civil monetary penalties against defendants to deter future violations, in an amount equal to three times the amount of the gain. Compl. at 76. Each of the other sixteen counts asks for similarly broad and sweeping monetary and injunctive relief, including prayers for a "return of all money the plaintiffs would have won had the blackjack game not been rigged, in an amount to be determined at trial, but conservatively estimated to be at least $347,532,800 for the last six years" and for "special damages for lost bets and income and expenses in an amount to be determined at trial." Compl. at 83, 86.

dants.[2] Most of them have developed card-counting skills which enable them to reduce or eliminate the normal odds in favor of the casinos. The corporate plaintiffs are corporations associated with plaintiff Doug Grant, Inc., a New Jersey corporation whose predecessor corporations were involved in operating card-counting schools and mock casinos set up by plaintiff and renowned card-counter Doug Grant. The complaint alleges that the schools and mock casinos were forced to close down in 1992 as the result of the Casino Defendants' alleged illegal countermeasures against card-counters and because of bomb threats, break-ins, destruction of property, theft of student lists, stalking and other intimidation tactics. Doug Grant, Inc. also provided the training for several cooperative player groups, including many plaintiffs, who pooled their financial resources and agreed to share their blackjack winnings.

### A. *The Play of Blackjack, Card-Counting and Shuffling-At-Will and Other Countermeasures*

The gravamen of plaintiffs' complaint is that the Casino Defendants undertake certain "illegal" countermeasures to eliminate the advantage a skilled card-counter may be able to gain over the casinos in the game of blackjack. Blackjack is the one casino game in which a player's skill may increase his chance of winning to the point of eliminating the winning odds in favor of the "house." Card-counters use intellect and memory to identify when, during the course of play, the odds of winning are better or worse. A short discussion of Atlantic City blackjack and the practice of card-counting is necessary to assist the reader in better understanding the plaintiffs' allegations.

Blackjack must be played with decks containing fifty-two cards of four suits (hearts, diamonds, clubs and spades) with each suit containing thirteen cards (Ace, King, Queen, Jack, 10, 9, 8, 7, 6, 5, 4, 3, 2). N.J.A.C. 19:46–1.17. Before blackjack games are commenced, the dealer receives one or more, usually between six to eight, decks from the casino supervisor and inspects them in the presence of the floorperson. *Id.* 19:46–1.18(a), (f); *id.* 19:47–2.4(a). After the cards are inspected, the dealer takes them to his table and spreads them out in a fan, face upwards, for visual inspection by the first player or players to arrive at the table. *Id.* 19:47–2.4(b). After the first player or players is afforded an opportunity to visually inspect the cards, the cards are turned face downward on the table, mixed thoroughly, shuffled until "randomly intermixed," and then placed into a stack. *Id.* 19:47–2.4(c); *id.* 19:47–2.5(a). After the shuffle is completed, the dealer asks the player seated at a certain position at the table, as defined by the regulations, *id.* 19:47–2.5(e), to cut the deck. *Id.* 19:47–2.5(b). The player cuts the deck by placing a plastic cutting card in the stack at least ten cards from either end. *Id.* 19:47–2.5(c). Once the cutting card has been inserted by the player, the dealer takes all the cards in front of the cutting card and places them at the back of the stack. *Id.* 19:47–2.5(d). The dealer then takes the entire stack of cards that was just shuffled and cut and aligns it along the side of the dealing shoe which has a mark on the side that enables the dealer to insert the cutting card so that it is in a position "at least approximately" one-quarter of the way from the back of the stack. *Id.* 19:47–2.5(d); *see id.* 19:46–1.19(d)(4). The stack of cards is then inserted into the dealing shoe for commencement of play. *Id.* 19:47–2.5(d). The cards behind the cutting card will not be used during the game.[3] *Id.* 19:47–2.5(h). The dealer then deals the cards to the players in a series of blackjack hands until the dealer reaches the cutting card. Once the cutting card is reached, the dealer repeats the shuf-

---

**2.** The complaint alleges that only six of the sixty individual plaintiffs are not skilled card-counters. Compl. at ¶ 65.

**3.** Plaintiffs allege that most blackjack players refuse to play if the dealer places the cutting card more than seventy—ninety cards from the back of the stack. The closer the cutting card is to the rear of the stack, the greater the card-counter's ability to determine whether the shoe is rich in player-favorable cards. Placing the cutting card closer to the front of the stack disadvantages the card counter, but also reduces casino profitability since more time-consuming shuffles will be needed. *See infra* at 7.

**524**

fling process and cutting procedures described above. *Id.*

In the game of blackjack, where the object of play is to reach as close to a total card value of "21" without exceeding that value, certain cards are more favorable to the player and certain cards are more favorable to the dealer. The player-favorable cards are the Ace, King, Queen, Jack and Ten. The dealer-favorable cards are the 6, 5, 4, 3, and 2. The 7, 8, and 9 are neutral. At any given point during the play of a shoe, the shoe might contain more player-favorable cards or it might contain more dealer-favorable cards. When there are more player-favorable cards, the players' chances of winning are increased. When there are more dealer-favorable cards, the dealer's chances of winning are increased. Whether and when a shoe will turn out to be player-or dealer-favorable is purely random.

Card-counters attempt to "count cards" so as to determine whether and when a shoe is player-favorable. They then vary their bets, betting high when the shoe is player-favorable and low when the shoe is dealer-favorable. Bets are placed before each individual round of blackjack and are generally based on the approved minimums and maximums for the table. According to the plaintiffs, successful card-counting contains several basic elements. These include: the assignment of a point value to each card, maintaining a running total of those points during play, betting strategies, playing strategies, money management, a sufficient bankroll, and "the intangible ability to consistently apply these interrelated strategies under fast-paced casino conditions." Compl. at ¶ 133.1.

In order to have the most success, card-counters need to be able to view, through the rounds of play, as many of the cards in the shoe as possible. The greater number of cards they are able to view, the easier it is for them to determine whether the remaining cards in the shoe are player-favorable or dealer-favorable. For this reason, card-counters prefer that the dealer places the cutting card toward the end of the shoe, leaving the fewest number of cards behind the cutting-card and increasing the overall number of cards in play. Card-counters also

prefer to have the entire shoe of cards played. If the dealer decides to reshuffle prior to reaching the cutting card, then the card-counters' opportunity to bet high on a shoe with a remainder of mostly player-favorable cards is eliminated. The casinos, on the other hand, prefer to decrease the card-counters' opportunity to bet high on a player-favorable shoe. Therefore, it is in their interest to decrease the card-counters' chances of determining whether a shoe is player-favorable by playing with fewer cards in the shoe (placing the cutting card as far away from the back of the stack as permitted by the regulations). It is also in the casinos' interest to reshuffle prior to reaching the cutting card when the remaining cards in a shoe are player-favorable. However, neither of these practices come completely free of cost to the casino: the more often the dealer must undertake the meticulous shuffling process, the shorter the actual time of play and the smaller the profits.

Plaintiffs allege that the casinos maintain their own card-counting teams and/or video and computer surveillance equipment to identify card-counters and inform the dealers of their participation in a blackjack game so that the dealers can take certain countermeasures against them. Plaintiffs challenge these practices as violations of the "cheating games" statute which provides that it shall be unlawful "knowingly to deal, conduct, carry on, operate or expose for play any game or games played with cards ... which have in any manner been marked or tampered with, or placed in a condition, or operated in a manner, the result of which tends to deceive the public or tends to alter the normal random selection of characteristics or the normal chance of the game which could determine or alter the result of the game." N.J.S.A. 5:12–115. First, they claim that the identifying process is fundamentally flawed because it tends to unfairly misidentify non-card-counters as card-counters. They claim casinos define card-counters as (1) any patron who increases a bet during a player-favorable count, or (2) any patron who knows or is related to someone who has increased a bet during a player-favorable count. According to plaintiffs, once identified, that player is

"branded for life" and never able to play a "fair" game of blackjack without being subjected to countermeasures. The casinos allegedly share information about suspected card-counters through defendant Griffin Investigations and other similar agencies. These agencies allegedly keep dossiers containing the pictures of suspected card-counters which casino employees then use to spot card-counters for purposes of knowing when to implement countermeasures.

Second, plaintiffs claim that the casinos utilize what they term the "cheating-at-will" preferential shuffle and which, as codified by the regulations, is generally known as the "shuffle-at-will." The shuffle-at-will occurs when the dealer is instructed to reshuffle prior to the cut-card marker because the casino card-counting team has determined that the shoe is player-favorable and card-counters are suspected to be playing at a given table. Plaintiffs allege that the shuffle-at-will provides an extra 2% advantage to the casino, nearly double the casinos' normal chance of winning, providing the casinos with a windfall of millions of dollars. They also claim that the shuffle-at-will can be abused and used to the disadvantage of non-card-counters because dealers and pit bosses can use it to increase their revenues even when there is no suspected card-counter playing at a table. Plaintiffs recount specific instances in which individual plaintiffs allegedly were subjected to shuffling-at-will by specific defendants throughout the past ten years. On some, but not all, of these occasions, the individual defendant would report the shuffle-at-will to the CCC and/or Department of Gaming Enforcement ("DGE") official required to be on-site at every casino. Ac-

cording to plaintiffs, no casino has ever responded to such complaints by admitting to counting cards and shuffling during a player-favorable count.

Third, plaintiffs, allegedly because they have been identified as card-counters, complain about being limited to one wager, being refused a deal, having bets pushed back, being forced to bet below the original posted limit, and having "shills"[4] occupy all seats at tables at which they wished to play. They allege that they were treated in this manner while other non-card-counting players were not. Fourth, plaintiffs claim that the Casino Defendants denied them "comps"[5] after identifying them as card-counters. Finally, plaintiffs allege that they have been threatened, assaulted and stalked because of their suspected card-counter status. They allege that they have been threatened in person while at the casinos by both known and unknown casino employees and that they have been threatened and sent pornographic materials over the Internet by unnamed John Does allegedly connected to the casinos.

B. *The Casino Control Act and CCC Regulations*

The Casino Control Act, N.J.S.A. 5:12–1 et seq. (the "Act"), gives the CCC comprehensive authority to define and regulate the rules and conduct of play for blackjack and other authorized casino games. *See Uston v. Resorts Int'l Hotel, Inc.,* 89 N.J. 163, 169, 445 A.2d 370 (1982) (citing N.J.S.A. 5:12–70f and 100e); *see also Campione v. Adamar of N.J.,* 302 N.J.Super. 99, 113–14, 694 A.2d 1045 (App.Div.1997), *cert. granted,* 152 N.J. 9, 702 A.2d 348 (1997).[6] It also grants the CCC

---

4. "Shills" are persons used by the casinos to induce potential patrons to enter a casino or entice potential patrons to play any game. Use of "shills" is specifically prohibited by the Casino Control Act (the "Act"). N.J.S.A. 5:12–100(1). Plaintiffs misuse the term "shills." In fact, what they complain about is the use of "anti-shills," persons trying not to *induce* players to play a game but instead persons trying to *prevent* players from playing a game.

5. "Comps" are complimentary services such as free goods, drinks, meals, parking, lodging transportation, and entertainment expenses which casinos are authorized, but not required, to provide patrons pursuant to N.J.S.A. 5:12–102(m).

6. *Uston* and *Campione* are the seminal cases addressing the battle between the Atlantic City casinos and blackjack card-counters. The New Jersey Supreme Court in *Uston* determined that the casinos could not exclude card-counters from their premises, as the CCC had not authorized exclusion of card-counters. *Uston,* 89 N.J. at 166, 445 A.2d 370. The Court also held that the Act gives the CCC exclusive and plenary authority "to set the rules of licensed casino games, which includes the methods for playing those games." *Id.* at 166, 445 A.2d 370.

*Campione,* which is currently before the New Jersey Supreme Court, addressed many of the same issues raised in this complaint. Specifical-

"exclusive jurisdiction" over the interpretation and enforcement of regulations governing "all matters delegated to it or within the scope of its powers under the provisions of [the Act]." N.J.S.A 5:12–133(b); *see id.* 5:12–69 to 70. Among the matters that the Act delegates to the CCC are the promulgation of regulations regarding the rules of casino games, including blackjack, *id.* 5:12–69, 70(f), gambling related advertising, *id.* 5:12–70(o), and the enforcement of gaming regulations, including the investigation, adjudication, and punishment of regulatory violations, *id.* 5:12–63(b), (f), (g); 5:12–64; 5:12–129.

The regulations governing blackjack are exhaustive and set forth in great detail the rules for the conduct of the game. *See* N.J.A .C. 19:47–2.1 et seq. As recognized by the New Jersey Supreme Court, "[i]t is no exaggeration to state that the Commission's regulation of blackjack is more extensive than the entire administrative regulation of many industries." *Uston,* 89 N.J. at 169, 445 A.2d 370. The CCC is very aware of the

ly, it dealt with the issue of which countermeasures, short of exclusion, the casinos could utilize to neutralize the threat posed by card-counters. In *Campione,* the plaintiff, Mr. Campione, a skilled card-counter, alleged that he was treated in a discriminatory manner by the casinos in their implementation of certain CCC regulations. He claimed that Tropworld, the casino in which he most frequently played blackjack, engaged in practices of shuffling-at-will, lowering the maximum betting limit and restricting him to playing only one hand. He maintained that Tropworld would allow other players at the same table to bet above the maximum limit, to play more than one hand, and to play against the dealer one-on-one, while prohibiting him from doing the same. More specifically, Campione alleged that on one occasion, he was playing and card-counting at a Tropworld table with a minimum bet of $25 and a maximum bet of $1000, when he placed a $350 bet in the betting circle. Immediately, the casino floor supervisor, who was also a member of the casino's card-counting team, instructed the dealer to change the betting-limit sign. Campione was told that he could bet only $100, while the other player at the table was told he could bet up to $1000. The dealer began dealing and pushed Campione's money out of the betting circle. Campione pushed his money back into the circle. Play began and Campione received a ten or an eleven and sought to "double down" his bet by betting an additional $350. He next received a nine or a ten, winning the hand. The casino payed him only $200, $100 for each of his two bets, instead of the $700 to which Campione believed he was entitled. A confrontation be-

card-counter controversy. As both plaintiffs and defendants have recognized, the CCC has carefully considered and addressed in both proposed and adopted blackjack regulations the effect card-counters can have on the game and the ways in which casinos should be permitted to respond to professional card-counters. *See, e.g.,* 14 N.J.R. 467–70 (May 17,. 1982); 14 N.J.R. 559–69 (June 7, 1982); 14 N.J.R. 841 (Aug. 2, 1982); 23 N.J.R. 1784(b) (June 3, 1991); 23 N.J.R. 2613(a) (Sept. 3, 1991); 23 N.J.R. 3350 (Nov. 4, 1991); 23 N.J.R. 3354 (Nov. 4, 1991); 25 N.J.R. 3953(a) (Sept. 7, 1993); 25 N.J.R. 5521(a) (Dec. 6, 1993). The CCC regulations authorize the casinos to use certain countermeasures to prevent professional card-counters from overcoming the statistical advantage that is necessary to ensure the casinos' financial viability.

The adoption of many of the CCC regulations authorizing countermeasures occurred in response to the New Jersey Supreme

tween Campione and the floor supervisor and the CCC and DGE representatives ensued, but Campione never received further money. *See generally, Campione v. Adamar of N.J.,* 274 N.J.Super. 63, 643 A.2d 42 (Law Div.1993); *Campione,* 302 N.J.Super. 99, 694 A.2d 1045.

The trial court in *Campione* granted summary judgment to Tropworld as to its right to shuffle-at-will, but allowed Campione's cause of action for discrimination to proceed to trial. *Campione,* 274 N.J.Super. at 83, 643 A.2d 42. The jury awarded *Campione* $1,519,873.43. *Campione,* 302 N.J.Super. at 102, 694 A.2d 1045. The appellate court reversed the verdict, holding that the claim never should have been heard in court since the CCC has exclusive jurisdiction over claims regarding casino implementation of CCC regulations and therefore no private right of action existed. *Campione,* 302 N.J.Super. at 110–18, 694 A.2d 1045. The appellate court also determined that the actions taken by Tropworld were specifically permitted by the CCC regulations. *Id.* at 103, 694 A.2d 1045. Finally, it found that the CCC authorized the disparate treatment of card-counters. *Id.* at 110, 694 A.2d 1045.

The Supreme Court granted certification on October 7, 1997. *Campione,* 152 N.J. 9, 702 A.2d 348 (1997). Briefs were submitted on behalf of the parties and by the CCC and DGE. Oral argument, including comments by the CCC and DGE supporting the practices authorized by the CCC regulations and used against Campione, was held on March 16, 1998. No opinion has yet been issued.

Court's ruling in *Uston v. Resorts Int'l Hotel, Inc.*, 89 N.J. 163, 445 A.2d 370 (1982). At issue in *Uston* was whether or not casinos had the authority to exclude card-counters from their premises. The Court determined that casinos were not authorized to exclude card-counters. It reasoned that the Act gave the CCC exclusive and plenary authority to set the rules and methods of play of casino games and that the CCC had not authorized exclusion as a countermeasure. *Id.* at 166, 445 A.2d 370. The Court suggested that, if the CCC wanted to approve measures to neutralize the card-counter threat, regulations to that effect, short of violating possible constitutional and statutory limits by fully excluding card-counters altogether, could be adopted. *Id.* at 372, 375–76. In fact, prior to *Uston*, the CCC had already codified a practice originally not intended as a card-counter countermeasure but eventually used by the casinos for that purpose. This regulation provided that: "[a] casino licensee may permit a player to wager on more than one box at a Blackjack table." N.J.A.C. 19:47–2.14.[7] The CCC had been allowing the use of this practice against card-counters through its approval of casinos' internal Section 99 controls. *See* N.J.S.A. 5:12–99.[8] The rule specifically offered casinos' discretion to allow players (usually non-card-counters) to

bet on more than one box, and presumably, in light of the discretionary language, allowed them *not* to permit card-counters to bet on more than one box.[9]

After *Uston*, the CCC held a series of hearings on the issue of card-counters and decided to enact regulations authorizing certain measures casinos could use to neutralize the potential negative effect card-counters could have on their financial viability. *See Campione*, 302 N.J.Super. at 103, 694 A.2d 1045. The new regulations, which the New Jersey Supreme Court urged the CCC to adopt in lieu of allowing the casinos to exclude card-counters, balanced the statutory goals of casino viability and fair odds to all players, N.J.S.A. 5:12–100e, and were intended to ensure both the fairness and integrity of casino gambling and "the right of the casinos to have the rules drawn so as to allow some reasonable profit." *Uston*, 89 N.J. at 175, 445 A.2d 370; *see, e.g.*, 14 N.J.R. 560–61 (June 7, 1982); 23 N.J.R. 1784 (June 3, 1991).

Several of these countermeasures involved the manner in which casinos could shuffle the blackjack cards. The first approved shuffling method was known as the "Bart Carter Shuffle," a "shuffling procedure in which approximately one deck of cards is shuffled after being dealt, segregated into separate

7. This 1978 regulation also provided that the CCC could prohibit a casino from allowing patrons to wager on more than one box at a blackjack table. The CCC felt it needed this authority, because in 1978 there was only one casino in Atlantic City, and it wanted to ensure that, when the blackjack tables were crowded, as many players as possible were given the opportunity to play. This language was deleted in 1991. *See* 23 N.J.R. 1784(a) (June 3, 1991); 23 N.J.R. 2869(b) (Sept. 16, 1991).

The Appellate Division in *Campione* seems to have been under the impression that N.J.A.C. 19:47–2.14, authorizing the casinos to permit a player to wager on more than one box, was also adopted as part of the cardcounter countermeasures adopted in 1982 subsequent to the *Uston* decision. *See Campione*, 302 N.J.Super. at 103, 694 A.2d 1045. However, N.J.A.C. 19:47–2.14 was adopted well before *Uston*, and was originally not intended as a countermeasure despite the fact that eventually it was used by the casinos for that purpose.

8. Section 99 controls are a broad set of internal practices which casinos use to implement the

CCC regulations in all areas of casino operation. As part of their Section 99 controls, casinos are required to provide the CCC with all of the practices they utilize to combat card-counters. If the CCC determines that any of these practices violate the regulations, it will not approve the offending casino's Section 99 controls.

9. The CCC's attorneys have taken the position that because the regulation affords the casinos discretion to permit a player to wager on more than one box, they likewise have discretion not to permit a player to wager on more than one box. *See* Unofficial Transcript of Oral Argument in *Campione*, 152 N.J. 9, 702 A.2d 348, (March 16, 1998), Exh., 6 to Pl. Rule 11 Br. Although the CCC has never officially ruled on the issue and claims that the regulation was not originally aimed at card-counters, it is aware of how the regulation is used and it has left the regulation in place. *See id.* Similarly, the CCC approves the casinos' internal Section 99 controls which permit casinos to allow one player to wager on more than one box but to prohibit another player from so doing. *See id.* at 15; CCC Br. to New Jersey Supreme Court in *Campione*, Exh. H to Casino Defendants Reply Br. at 6.

stacks and each stack is inserted into pre-marked locations within the remaining decks contained in the dealing shoe." N.J.A.C. 19:47–2.1; *see* N.J.R. 559(b) (June 7, 1982); 14 N.J.R. 841(b) (Aug. 2, 1982). Another approved shuffling countermeasure, known as the "shuffle-at-will," was approved by the CCC to allow the casinos to shuffle after any round of play. The CCC amended the existing shuffle regulation by adding language regarding the casinos' ability to shuffle "after any round of play:"

> (a) Immediately prior to commencement of play, *after any round of play* as may be determined by the casino licensee and after each shoe of cards is dealt, the dealer shall shuffle the cards so that they are randomly intermixed...
>
> (h) A reshuffle of the cards in the shoe shall take place after the cutting card is reached in the shoe ... except that:
>
> 1. The casino licensee may determine *after each round of play* that the cards should be reshuffled;
>
> 2. When the "Bart Carter Shuffle" is utilized a reshuffle shall take place after the cards in the discard rack exceed approximately one deck in number.

N.J.A.C. 19:47–2.5 (emphasis added); *see* 14 N.J.R. 559(b) (June 7, 1982), 14 N.J.R. 841(b) (Aug. 2, 1982).

Finally, the use of a device known as the continuous shuffling shoe was approved:

> In lieu of the dealing and shuffling requirements set forth in N .J.A.C. 19:47–2.5 and 2.6, a casino licensee may utilize a dealing shoe or other device designed to automatically reshuffle the cards provided that such shoe or device and the procedures for dealing and shuffling the cards through the use of this device are approved by the Commission or its authorized designee.

N.J.A.C. 19:47–2.20; *see* 14 N.J.R. 559(b) (June 7, 1982), 14 N.J.R. 841(b) (Aug. 2, 1982).

The shuffling regulations, particularly the most commonly used shuffle-at-will, enabled the casinos to lessen the card-counters' ability to determine whether cards remaining in the shoe were player-favorable. As already noted, when the cards are reshuffled continu-ously or prior to reaching the cutting-card, card-counters lose their potential advantage over the casinos because they can no longer begin betting high wagers only when they know their chances of receiving player-favorable cards have been increased. Though effective against card-counters, the use of these shuffling regulations increases shuffling time and thereby causes the casinos to lose revenue.

The CCC also authorized one non-shuffling countermeasure after the *Uston* decision—an increase in the number of decks casinos were allowed to. use in blackjack play. N.J.A.C. 19:47–2.2. This helped the casinos combat card-counters by increasing the number of cards card-counters would have to be able to track in order to determine whether a shoe was player-favorable.

After these initial countermeasures were authorized, the CCC in 1991 approved another regulation which provided that:

> a casino licensee may at any time change the permissible minimum or maximum wager at a table game, without notifying the Commission of such change, upon posting a sign at the gaming table advising patrons of the new permissible minimum or maximum wager and announcing the change to patrons who are at the table.

N.J.A.C. 19:47–8.3(c); *see* 23 N.J.R. 1784(b) (June 3, 1991); 23 N.J.R. 2613(a) (Sept. 3, 1991); 23 N.J.R. 3350(a) (Nov. 4, 1991); 23 N.J.R. 3354(c) (Nov. 4, 1991). This gave the casinos the ability to automatically lower the betting limit whenever it identified a card-counter playing at one of its tables so that the card-counter would not be able to bet high when the shoe became player-favorable. Then, in 1993, one further addition was made:

> (b) A casino licensee may offer:
>
> 1. Different maximum wagers at one gaming table for each permissible wager in an authorized game; and
>
> 2. Different maximum wagers at different gaming tables for each permissible wager in an authorized game.
>
> (c) A casino licensee shall provide notice of the minimum and maximum wagers in effect at each gaming table, and any changes

thereto, in accordance with N.J.A.C. 19:47–8.3.

(d) Any wager accepted by a dealer which is in excess of the established maximum permitted wager at that gaming table shall be paid or lost in its entirety in accordance with the rules of the game, notwithstanding that the wage exceeded the current table maximum.

N.J.A.C. 19:47–8.2(b)–(d); *see* 25 N.J.R. 3953(a) (Sept. 7, 1993); 25 N.J.R. 5521(a) (Dec. 6, 1993). This regulation clarified that the casinos could specifically limit the wagers of only those patrons identified as card-counters, while permitting non-card-counters to continue betting at higher limits.

The New Jersey courts have recognized the legality of the CCC-authorized countermeasures. In particular, they have recognized that the practice of "shuffling at will," the central concern of plaintiffs' 157 page complaint, is authorized by the CCC regulations, N.J.A.C. 19:47–2.5, and affects all patrons, even those not counting cards, at a blackjack table. *See Campione*, 274 N.J.Super. 63, 79–80, 643 A.2d 42 (Law Div.1993), *rev'd*, 302 N.J.Super. 99, 694 A.2d 1045 (App. Div.1997), *cert. granted*, 152 N.J. 9, 702 A.2d 348. Further, the Appellate Division in *Campione*, 302 N.J.Super. at 110, 694 A.2d 1045, found that the CCC "authorizes the disparate treatment of card-counters." It noted that the countermeasures allowing betting limits and permitting casinos to vary the number of boxes which particular players can wager on have all been approved by the CCC. *Id.* at 103, 694 A.2d 1045. Most important, the Appellate Division ruled that "there is no private cause of action against a casino for its alleged violation of [CCC] regulations governing the manner in which games are played." *Id.* at 118, 694 A.2d 1045. Even prior to the *Campione* ruling, this Court had suggested in a footnote that no cause of action exists against casinos for alleged violations of the Act or CCC regulations. *Tose v. Greate Bay Hotel and Casino Inc.*, 819 F.Supp. 1312, 1316–17 n. 8 (D.N.J.1993), *aff'd*, 34 F.3d 1227 (3d Cir.1994). The Third Circuit has subsequently agreed with our

view, holding in *Hakimoglu v. Trump Taj Mahal Associates*, 70 F.3d 291, 293–94 (3d Cir.1995), what we suggested in *Tose:* that where the Act and CCC regulations do not expressly authorize imposing liability on a casino for conduct clearly within the ambit of the detailed casino regulations, no private cause of action exists.

### C. CCC Complaint Mechanism

The CCC's regulatory enforcement powers include the authority to receive complaints about violations of CCC regulations, to investigate such complaints, and to hold hearings. N.J.S.A. 5:12–63(b), (f), (g); *id.* 5:12–66. The CCC also has the power to penalize casinos for regulatory violations by issuing reprimands, imposing monetary civil penalties, and even revoking licenses. *Id.* 5:12–64 to 129. The CCC can also require a casino to make restitution to a complainant. Id. 5:12–129(6). If, at the end of this enforcement process, a complainant is not satisfied, the complainant may appeal the CCC's determination to the Appellate Division. *Id.* 52:14B–12.

### D. Lawyer Defendants

The Lawyer Defendants gave plaintiffs varying degrees of advice with respect to the claims alleged in this complaint and possible other claims related to the same set of facts. Plaintiffs now allege malpractice claims, essentially stemming from the loss of potential claims due to various statutes of limitations. They also assert claims against the Quinne, Dunne, Dailey & Higgins defendants for failure to assist plaintiffs in receiving a portion of the judgment in the test case of *Campione*,[10] with which plaintiffs allege they were associated.

### E. Procedural History

Plaintiffs initiated this action by filing a 74–page single-spaced complaint in the Superior Court of New Jersey, Middlesex County, on July 18, 1997. On August 6, 1997, plaintiffs filed a petition with the CCC setting forth the identical claims. By letter dated

---

**10.** As noted earlier, *see supra* note 6, the verdict in *Campione* was reversed by the Appellate Division, 302 N.J.Super. 99, 694 A.2d 1045, and is currently pending before the Supreme Court.

August 20, 1997, the CCC responded that no action would be taken on plaintiffs' petition pending the New Jersey Supreme Court's consideration of the Petition for Certification in *Campione. See Campione*, 302 N.J.Super. 99, 694 A.2d 1045, *cert. granted*, 152 N.J. 9, 702 A.2d 348. On August 28, 1997, defendants removed the case to this Court.

Prior to the initial scheduling conference, counsel for the Casino Defendants met with plaintiffs' counsel in an effort to narrow the issues raised in the complaint. That effort was formalized ·as part of the Management Order issued by Magistrate Judge Joel B. Rosen on November 6, 1997. As directed by that order, the defendants provided plaintiffs with a letter, dated November 6, 1997, describing their position as to why the complaint should be withdrawn ("Rule 11 Letter"). In response, plaintiffs filed a 157-page one-and-a-half spaced amended complaint [hereinafter "complaint"], which omitted the antitrust, Fair Credit Reporting Act, and Consumer Fraud Act[11] claims contained in the original complaint but added several constitutional and civil rights claims as well as allegations regarding the transmission of threatening and pornographic messages over the Internet.

## II. DISCUSSION

### A. *Standard of Review*

Fed.R.Civ.P. 12(b)(6) provides that a court may dismiss a complaint "for failure to state a claim upon which relief can be granted." In considering a Rule 12(b)(6) motion, the court will accept the allegations of the complaint as true. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Dismissal of claims under Fed. R.Civ.P. 12(b)(6) should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Although the court must assume as true all facts alleged, "[i]t is not ... proper to assume that the [plaintiff] can prove any facts that it has not alleged." *Associated General Contractors of Calif.,*

*Inc., v. California State Council of Carpenters*, 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). Finally, when "[c]onfronted .with [a 12(b)(6) ] motion, the court must review the allegations of *fact* contained in the complaint; for this purpose the court does not consider conclusory recitations of law." *Commonwealth of Pennsylvania v. PepsiCo, Inc.*, 836 F.2d 173, 179 (3d Cir.1988) (emphasis added).

### B. *Fed.R.Civ.P. 8(a)*

Fed.R.Civ.P. 8(a) provides that "[a] pleading which sets forth a claim for relief ... shall contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). All the Rule requires is a short and plain statement of the claim that will give the defendants fair notice of what the plaintiff's claim is and the grounds upon which it rests. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993).

Tipping the scales at nearly 157 pages, the complaint hardly comports with principles of brevity. As this Court has previously noted, "[t]he length of the Complaint might not be deserving of criticism were all of it necessary." *See Simmerman v. Corino*, 804 F.Supp. 644, 648 (D.N.J.1992), *aff'd*, 16 F.3d 405 (3d Cir.1993). In addition to being overly long, the complaint is inconsistent and confusing, causing this Court to expend much valuable time in an effort to discern its meaning. While the allegations regarding the so-called "cheating-at-will" preferential shuffle are very specific and repetitive, the legal basis for this claim "seems to float free from its moorings and drift into a swirl of dramatic" and largely irrelevant contentions of perceived violations of the CCC regulations. *Id.* On the other hand, the allegations that defendants violated plaintiffs' constitutional rights, statutory civil rights, and various common law tort principles are vague, ambiguous and clearly insufficient to provide proper notice to allow defendants to adequately respond to the complaint and prepare for trial. There is a strong argument

---

**11.** In their reply brief, plaintiffs, without leave of court, reassert their Consumer Fraud Act claim.

that portions of the complaint fail to comply with the strictures of Fed.R.Civ.P. 8(a) and might afford this Court a sufficient basis for dismissal.[12] However, a dismissal without prejudice under Fed.R.Civ.P. 8(a) would only lead to a new filing and needlessly increase the amount of time and money already expended. Thus, the Court will plunge into the complaint's "Serbonian Bog" [13] and deal with the pending Fed.R.Civ.P. 12(b)(6) motions on the merits.

Plaintiffs' wide-ranging and often diverse claims in the complaint naturally fall into two categories: those based on alleged violations of the CCC regulations and those based on unrelated and separable state common law claims such as personal injury, invasion of privacy, defamation, and attorney malpractice. Our original jurisdiction over this matter is based entirely upon federal questions raised in some of those claims based on alleged violations of the CCC regulations. The CCC regulation claims are in the First, Second, Third, Fifth, Sixth, Seventh Counts and in a claim not included in the complaint which plaintiffs now seek leave to add. The remaining claims, although claimed to be within our supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a), are separable from the CCC regulation claims if they do not arise from a common nucleus of operative fact and thus fail to form part of the same case or controversy for purposes of supplemental jurisdiction. 28 U.S.C. § 1367(a); *see United Mine Workers v. Gibbs*, 383 U.S. 715, 725–26, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Simmerman v. Corino*, 804 F.Supp. 644, 658 (D.N.J.), *aff'd*, 16 F.3d 405 (3d Cir.1993). Under 28 U.S.C. § 1367(c)(3), we also have discretion to decline jurisdiction over any and all pendent state law claims once all federal claims have been dismissed. *See Kessel v. B.A.T. Indus., P.L.C.*, 964 F.Supp. 164 (D.N.J.1997) (once federal RICO claim was dismissed, district court declined supplemental jurisdiction over state common law fraud,

civil conspiracy, negligence and negligent misrepresentation claims); *Ifert v. Miller*, 138 B.R. 159 (E.D.Pa.1992) (once federal RICO claim was dismissed, district court declined supplemental jurisdiction over state common law contract, fraud, and tortious interference claims), *aff'd* 981 F.2d 1247 (3d Cir.1992); *Freund v. Florio*, 795 F.Supp. 702 (D.N.J.1992) (once Fourteenth Amendment challenges were dismissed, district court would not retain supplemental jurisdiction over pendent claims under New Jersey Constitution). Because our ability to adjudicate plaintiffs' complaint hinges on the survival of the CCC regulation claims, we must first address the merits of these claims. We will then consider whether we should decline to exercise supplemental jurisdiction over the marginally-related state law claims contained in the Eighth. Ninth, Tenth and Eleventh Counts and the malpractice claims against the Lawyer Defendants.

### C. RICO Claims

▮ Plaintiffs' First Count alleges claims for racketeering under federal RICO, 18 U.S.C. § 1964(c), New Jersey RICO, N.J.S.A. 2C:41–4(c), and the Act RICO. N.J.S.A. 5:12–127(c). As defendants point out, the predicate acts of alleged racketeering on which plaintiffs' RICO claims are based consist almost exclusively of the use of countermeasures or alleged violations of other CCC regulations. In order to make out a RICO claim, plaintiffs first must show predicate criminal acts undertaken by the defendants which are prohibited by the RICO statute at issue. *See, e.g.,* 18 U.S.C. § 1961, 1962. Plaintiffs claim the Casino Defendants committed the following predicate acts: shuffling-at-will when the count was player-favorable, using computer and video technology to assist in counting cards and identifying cardcounters, denying comps to plaintiffs, using shills, limiting plaintiffs to one hand of

---

**12.** The heart of plaintiffs' case is whether the Act authorizes the CCC to adopt the four or five countermeasures used by the casinos to frustrate card-counters, particularly the countermeasures which treat card-counters differently from other blackjack players. These could have been placed at issue in a clearly drafted complaint of no more than ten to fifteen pages.

**13.** John Milton, Paradise Lost, Bk. II, lines 591–94; *see also* Eugene M. Haring, Drug Abuse and Accidental Death Benefits: Hard Drugs and Hard Cases, 8 FORUM 45 n. 17 (1972).

blackjack at a time, and lowering betting limits. Based on the premise that these uses of authorized countermeasures and other alleged regulatory violations are criminal acts, plaintiffs' complaint alleges that the casinos' operation of blackjack violates criminal statutes regarding unlawful debt collection, transmission of gambling information, operation of illegal gambling business, and interstate commerce for an unlawful activity.

 The primary purported predicate act is the shuffling of cards when the count is favorable to the player, an act which several courts, including this Court, have held is legal. *See Hyland v. Griffin Investigation,* Civ. A. No. 95–223 (1996), Exh. A to Casino Defendants Br. The complaint alleges that use of the "shuffling-at-will" countermeasure constitutes a predicate act of racketeering because it violates the criminal casino "cheating" statute, N.J.S.A. 5:12–115. The trial court in *Campione* rejected this precise claim. *Campione,* 274 N.J.Super. at 80, 643 A.2d 42 ("labeling of the shuffling at will as 'cheating' is specious"). We agreed with the trial court's *Campione* holding in our opinion in *Hyland. See Hyland,* Civ. A. No. 95–223, at 19–20. Moreover, the language of the regulation itself makes clear that the casino may shuffle at the conclusion of any round of play, at its discretion:

> (a) Immediately prior to commencement of play, *after any round of play* as may be determined by the casino licensee and af-

ter each shoe of cards is dealt, the dealer shall shuffle the cards so that they are randomly intermixed.

> (h) A reshuffle of the cards in the shoe shall take place after the cutting card is reached in the shoe as provided in N.J.A.C. 19:47–2.6(1) except that: 1. The casino licensee may determine *after each round of play* that the cards shall be reshuffled.

N.J.A.C. 19:47–2.5(a), (h) (emphasis added).

Plaintiffs attempt at length to skew the logical interpretation of this statute and the relevant regulatory history leading to its passage in order to convince us that the CCC has authorized only a "random shuffle-at-will." [14] As the Casino Defendants point out, plaintiff' suggestion of the "random shuffle-at-will" is an oxymoron, one which the CCC never intended to impose on the casinos.

The regulatory history makes clear that the CCC is fully aware and approves of the practice of shuffling-at-will when there is a player-favorable count as a countermeasure against card-counters. When the CCC published the proposal to allow the casinos to shuffle-at-will, it noted that the casinos might shuffle when the count is favorable and that this practice might affect the odds of the game:

> The economic impact of this proposed amendment would vary depending on when in fact the cards were shuffled. For example, if the cards were always shuffled after

**14.** Not only have plaintiffs devoted a large portion of their brief in opposition to the Fed. R.Civ.P. 12(b)(6) motions to attempt to negate the plain language of the shuffle-at-will regulations by parsing regulatory and legislative history, but recently they have requested in their brief in response to the defendants' Rule 11 motions that this Court consider three new events they claim support their proposition that the CCC never authorized the shuffle-at-will. They now claim that comments made by the CCC and DGE during the course of various recent legal proceedings support their position. They rely on (1) CCC and DGE comments made during oral argument before the New Jersey Supreme Court in *Campione,* Unofficial Transcript of Oral Argument in *Campione,* 152 N.J. 9, 702 A.2d 348, (March 16, 1998), Exh. 6 to Pl. Rule 11 Br., (2) comments made by the CCC in a motion to dismiss an appeal taken by one of the plaintiffs to the New Jersey Appellate Division appealing a CCC letter stating that a casino had not violated

any regulation by shuffling-at-will, *In re: Patron Complaint* P98–0222 (Karen Dwyer), Exh. 8 to Pl. Rule 11 Br., and (3) a letter written by a CCC legal analyst which states that shuffling-at-will is permitted by the CCC regulations but that the CCC has no regulations addressing the so-called "preferential shuffle." Letter from CCC Legal Analyst Kenneth Doss to Martin Rose re: Patron Complaint P98–0299 (March 27, 1998), Exh. 9 to Pl. Rule 11 Br. While we are unable to determine from the documents submitted by the plaintiffs whether or not comments made by outside counsel and an in-house legal analyst reflect official positions held by the CCC or DGE (in fact the CCC legal analyst's letter explicitly states that "opinions set forth herein are those of the Commission staff and are not binding upon the Commission"), we are not at all persuaded by plaintiffs' view of the import of these various isolated comments. We feel that, if anything, the comments support our view of the shuffle-at-will regulations.

the first round of play regardless of the point count, then the casino advantage against the basic strategy player and average player would probably remain the same with the advantage enjoyed by the card-counter being decreased. If the cards, however, were only shuffled in positive point count situations and not in negative point count situations, the casino advantage against all types of players would increase.

14 N.J.R. 470 (May 17, 1982).

Furthermore, the regulatory history which plaintiffs painstakingly cite as support for their position that the CCC did not authorize the shuffle-at-will as a countermeasure does not prove what they would like it to prove. Plaintiffs rely on comments made during hearings on the proposed shuffle-at-will which explore possible disadvantages of the shuffle-at-will without acknowledging that, these disadvantages notwithstanding, the CCC decided that the shuffle-at-will was the best alternative to neutralize the threat posed by card-counters. The recent brief filed as the official CCC position before the New Jersey Supreme Court in the *Campione* case further demonstrates the CCC's unequivocal acceptance of the shuffle-at-will, as well as the other countermeasures plaintiffs allege constitute predicate acts. In their brief, the CCC specifically states "the practice of 'shuffling-at-will' is authorized by Commission regulations at N.J.A.C. 19:47–2.5 and affects all patrons at a blackjack table." CCC Brief at 5, Exh. H to Casino Def. Reply Br. The CCC brief continues:

> [T]he Commission accords to casino licensees the discretion to permit a player to wager on more than one "box" or place at a table. N.J.A.C. 19:47–2.14. The Commission has also approved internal control submissions, filed by casino licensees pursuant to N.J.S.A. 5:12–99, which give casino licensees the discretion to permit a player to exceed the wager limit at a table. No Commission regulation requires that these measures be applied on a table-wide basis, nor has the Commission otherwise

required such application of these rules. These rules balance the statutory goals of casino vitality and fair odds to all players, N.J.S.A. 5:12–100e, and must consider both the fairness and integrity of casino gaming and the "right of the casinos to have the rules drawn so as to allow some reasonable profit."

*Id.* at 5–6 (quoting *Uston,* 89 N.J. at 175, 445 A.2d 370). Plaintiffs simply cannot claim as predicate acts those practices clearly authorized by the CCC.

Plaintiffs' other alleged predicate acts are similarly insufficient to support a RICO claim. The alleged violations of criminal statutes regarding unlawful debt collection, 18 U.S.C. § 1962, transmission of gambling information, 18 U.S.C. § 1084, interference with commerce by threats or violence, 18 U.S.C. § 1951, interstate commerce for unlawful activity, 18 U.S.C. § 1952, and operating an illegal gambling business, 18 U.S.C. § 1955, all derive from the allegations regarding the use of authorized countermeasures and other alleged violations of the CCC regulations. Any debts allegedly "unlawfully collected" are those lost by plaintiffs during blackjack games played in accordance with the CCC regulations. Any "illegal gambling business" or "unlawful activity in interstate commerce" is simply the play of blackjack as authorized by the CCC. Similarly, the casinos do not engage "in unlawful activity" or "operating an illegal gambling business" by not offering plaintiffs "comps," which are free gifts casinos have absolutely no obligation to offer. These activities do not constitute crimes and therefore are not predicate acts. Furthermore, plaintiffs, although mentioning the use of "shills" in their complaint,[15] have not made any allegations that the casinos violate the statutory prohibition of the use of "shills," persons who induce potential patrons to enter a casino or induce them to play any game. N.J.S.A. 2:15–100(*l*). Thus, plaintiffs' "shills" allegation likewise fails to state a predicate act.

---

**15.** As noted earlier, *see supra* note 4, plaintiffs' complaints about "shills" are really complaints about the alleged use of "anti-shills."

The only alleged predicate acts that are not based on CCC regulations are the allegations of assaults, threats, and stalking in person and via the Internet. Plaintiffs allege that one plaintiff was knocked off his seat on one occasion, that some plaintiffs were followed around casinos, and that one plaintiff was grabbed by the arm while being escorted out of a casino. However, these minor altercations do not constitute crimes and therefore are not predicate acts. Nor do the plaintiffs' claims of receiving anonymous pornographic, offensive and threatening messages over the Internet from John Doe defendants constitute predicate acts as plaintiffs put forth no basis for alleging that the messages were sent by anyone associated with the Casino Defendants.

 Plaintiffs have also not alleged a compensable injury to "business or property" within the meaning of the RICO statutes. In order to state a claim under RICO, a plaintiff must allege an injury to "business or property" that is proximately caused by the RICO violation. 18 U.S.C. § 1964(c). Injury to "business or property" requires a "concrete financial loss, and not mere 'injury to a valuable intangible property interest.'" *Steele v. Hosp. Corp. of America*, 36 F.3d 69, 70 (9th Cir.1994). A lost opportunity to obtain a financial benefit is too speculative to constitute an injury to business or property under RICO. *Anderson v. Kutak, Rock and Campbell*, 51 F.3d 518, 522 (5th Cir.1995). A plaintiff must allege present, actual damages, not speculative claims of lost future opportunities. *Id.* at 522–23; *Steele*, 36 F.3d at 70–71. In addition, personal injuries are not

compensable under RICO. *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 918–19 (3d Cir.1991).

 The only injuries plaintiffs have identified in connection with their RICO claims are (1) the closing of card-counting schools and mock casinos, and (2) the loss of gambling income. The alleged closure of the card-counting schools and mock casinos might have constituted compensable injury for those plaintiffs involved in them if these alleged injuries had occurred within the four-year statute of limitations applicable to civil RICO claims. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997). However, as the schools were closed in 1992, the plaintiffs' RICO claim based on this predicate act is time-barred. Plaintiffs' alleged loss of tens of millions of dollars[16] in gambling income is far too speculative to constitute compensable injury to business or property. The loss of an opportunity to gamble under favorable conditions does not constitute injury to business since plaintiffs are not, and do not so allege in their complaint, in the "business" of gambling. It also does not constitute injury to "property" since there is no property right in the opportunity to gamble under any circumstances, let alone under favorable conditions. In addition, any such loss is far too speculative to be compensable, *see Anderson*, 51 F.3d at 522–23; *Steele*, 36 F.3d at 70–71, especially since the complaint itself acknowledges that there are numerous authorized countermeasures that the casinos can properly use to completely eliminate any possible advantage a card-counter might be able to obtain. Finally,

---

**16.** In their RICO count, plaintiffs allege an injury to business or property in their loss of tens of millions of dollars in lost gambling income. Compl. at ¶ 276. Later, plaintiffs make a claim for nearly two hundred and fifty million dollars, claiming "an extremely conservative and mathematically provable estimate of minimum losses ... over the last six years amount[ing] to $248,-000,000." *Id.* at ¶ 283. Factoring in the alleged value of lost comps, they claim the loss rises to $ 347,532,800. One paragraph of plaintiffs' complaint alleges that during a cooperative effort from June 1989 to May 1990, participating plaintiffs, betting an average of $400 per hand, made average daily wagers of approximately $5,760,-000 per day. It then alleges that use of shuffling-at will by the casinos resulted in lost income of

$115,000 per day (based on two shifts of 30 players playing four hours per shift, making an average of 60 wagers per hour at $4000 per wager and 2% additional casino advantage over the normal chance of the game as a result of the shuffle-at-will). If the casinos were not entitled to use the shuffle-at-will, plaintiffs claim they would have won, during this 11–month period of alleged daily playing by 30 players, approximately $37,950,000. If only 30 card-counters could cause this much loss, casinos would no longer be financially viable unless they ceased to offer the game of blackjack, one of the most popular casino games, or devised new countermeasures which would leave plaintiffs no better off than they are now.

most of the plaintiffs allegedly ceased card-counting prior to the four-year statute of limitations. Thus, plaintiffs RICO claims fail because they have not shown any predicate acts or any injury to "business" or "property." Accordingly, we will dismiss them under Rule 12(b)(6) for failure to state a claim upon which relief may be granted.

### D. Common Law Claims

Similarly, plaintiffs' claims in their Second Count (contractual claims), Third Count (fraud and misrepresentation claims), Fifth Count (tortious interference claims) and Seventh Count (negligence claims) fail to state claims upon which relief may be granted because the casinos are legally entitled to subject card-counters to countermeasures such as shuffling-at-will, keeping track of known card-counters, and advertising the game of blackjack as a fair game of chance. Although plaintiffs attempt to bolster their essential charge that the casinos cannot take countermeasures to neutralize card-counters by expanding it into these specious claims under the common law, the simple fact remains that the casinos are explicitly authorized to undertake the practices plaintiffs claim are illegal.

It is well-established that casino patrons cannot assert private causes of action based on alleged violations of CCC regulations regarding the rules of casino games. See Campione, 302 N.J.Super. at 110, 118, 694 A.2d 1045; Decker v. Bally's Grand Hotel Casino, 280 N.J.Super. 217, 222, 655 A.2d 73 (App.Div.1994). Even where, unlike here, a violation of the CCC regulations takes place, courts refuse to find a private cause of action. Miller v. Zoby, 250 N.J.Super. 568, 571–73, 595 A.2d 1104 (App.Div.), cert. de-

nied, 127 N.J. 553, 606 A.2d 366 (1991); cf. Hakimoglu, 70 F.3d at 293–94 (holding that casino is not liable under common law tort for serving patron free drinks and allowing him to continue gambling while intoxicated); Marcangelo v. Boardwalk Regency Corp., 847 F.Supp. 1222, 1229 (D.N.J.1994) (holding that common law claims for breach of contract and fraud based on conduct governed by CCC regulations are not viable, as the "respective rights and obligations of the parties have been articulated and developed by statutes and regulations, not by the common law," and thus such claims would be preempted by the Act), aff'd, 47 F.3d 88 (3d Cir.1995); Tose, 819 F.Supp. at 1316 n. 8 (suggesting no common law tort liability against casinos for serving patron alcoholic drinks and allowing her to continue gambling while intoxicated). Thus, we will dismiss these claims, like the RICO claims, pursuant to Rule 12(b)(6).[17]

### E. Constitutional and Civil Rights Claims

Plaintiffs' Sixth Count alleges violations of the Equal Protection Clause, the Due Process Clause, Article 1, paragraph 1 of the New Jersey Constitution, and 42 U.S.C. § 1983.[18] As defendants correctly point out, this count fails to state a claim upon which relief can be granted for several reasons. First, plaintiffs' allegations of state action are insufficient. State regulation and the CCC's authorization of casino activities does not transform the casinos into state actors. See Uston v. Hilton Hotels Corp., 448 F.Supp. 116, 118 (D.Nev.1978); State v. Sanders, 185 N.J.Super. 258, 267, 448 A.2d 481 (App.Div.1982). It is well-established that "[m]ere approval of or acquiescence in

**17.** We note that, even if plaintiffs did have a private cause of action against the casinos for alleged regulatory violations, their claim for tortious interference with prospective economic advantage would fail because it does not allege a reasonable expectation of economic advantage. See Woods Corporate Assoc. v. Signet Star Holdings, 910 F.Supp. 1019, 1031 (D.N.J.1995). The CCC regulations governing blackjack are designed to ensure a statistical advantage to the casinos, even against card-counters. See Campione, 302 N.J.Super. at 110, 694 A.2d 1045; Hyland, at 20, Exh. A to Casino Def. Br., Plain-

tiffs' claim that, nonetheless, they have a reasonable expectation of consistently winning great sums of money at blackjack ignores the economic reality of the New Jersey casino system.

**18.** The Sixth Count also alleges various state and federal statutory claims against the John Does for sending offensive messages and alleged threats over the Internet. These statutory claims are specious at best and need not be addressed further.

the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment." *Blum v. Yaretsky,* 457 U.S. 991, 1004–05, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982); *see Jackson v. Metropolitan Edison Comp.,* 419 U.S. 345, 350–51, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). Second, plaintiffs have not suffered any equal protection clause violation since, under the rational basis test applicable for a non-protected class such as card-counters subject to CCC regulations, *see Bally Mfg. Corp. v. New Jersey Casino Control Comm'n,* 85 N.J. 325, 335, 426 A.2d 1000 (casino regulations examined under rational basis test), *appeal dismissed,* 454 U.S. 804, 102 S.Ct. 77, 70 L.Ed.2d 74 (1981), the countermeasures used by the casinos and authorized by the CCC are rationally related to the legitimate state interest in protecting the financial viability of the casino industry. *See* N.J.S.A. 5:12–1(b)(12). Third, plaintiffs have no property interest in the opportunity to gamble and thus have not had their substantive due process rights violated. Therefore, we will dismiss plaintiffs' Sixth Count for failure to state a claim upon which relief can be granted.

### F. *Civil Conspiracy*

■ Plaintiffs' Thirteenth Count[19] against the Casino Defendants claims that all of the acts described in the complaint have been part of one overarching conspiracy among the Casino Defendants. This overly broad claim for civil conspiracy must fail. "The gravamen of an action in civil conspiracy is not the conspiracy itself but the underlying wrong which, absent the conspiracy, would give a right of action." *Bd. of Educ., of Asbury Park v. Hoek,* 38 N.J. 213, 218, 183 A.2d 633 (1962); *see Resolution Trust Corp. v. Wilson,* 851 F.Supp. 141, 147 (D.N.J.1994). Because we have dismissed all of the other claims of alleged wrongdoing and because the only possible cooperation among the defendants took place through "sharing of information as to who card-counters are [which] is not itself an illegal conspiracy," *Hyland,* at 29, we will similarly dismiss their claim for civil conspiracy.

### G. *Consumer Fraud Act Claim*

Plaintiffs omitted in their amended complaint, a claim contained in their original complaint, for violation of the New Jersey Consumer Fraud Act. In their brief and in a letter to defendants, plaintiffs have asked that they now be permitted leave to amend the complaint to reinclude the Consumer Fraud Act claim. Defendants have addressed the merits of any Consumer Fraud Act claim in their motion to dismiss papers. We will treat plaintiffs' request in their brief and defendants' apparent non-objection as a stipulation for leave to amend the complaint. However, we must deny leave for an amendment to re-include this claim because it is completely without merit and it would be futile to amend the complaint to include a meritless claim. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997) ("Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and *futility*") (emphasis added).

■ The New Jersey Supreme Court has recently held that the Consumer Fraud Act will not apply to a heavily regulated industry when application of that statute would create a "real possibility" of conflict between the directives of the Consumer Fraud Act, as administered by the Division of Consumer Affairs, and the directives of the regulatory schemes of other administrative bodies. *Lemelledo v. Beneficial Management Corp. of America,* 150 N.J. 255, 268, 696 A.2d 546 (1997). The Act will not apply where "the other source or sources of regulation deal specifically, concretely, and pervasively with the particular activity, implying legislative intent not to subject parities to multiple regulations that, as applied, will work at cross-purposes." *Id.* at 270, 696 A.2d 546. Here, the Act evidences a clear legislative intent to have the rules of casino gaming, and the advertising related thereto, governed exclusively by the CCC. *See* N.J.S.A. 5:12–133(b); *id.* 5:12–70(*o*). To allow claims such as the plaintiffs' to proceed in federal court under the Consumer Fraud Act would create conflicts with the CCC's

---

**19.** This Count is not numbered, but appears after the Twelfth Count against the Casino Defendants.

regulatory scheme. The regulation of the game of blackjack, including shuffling-at-will and the advertisement of blackjack and its rules, is an issue that is within the exclusive jurisdiction of the CCC and about which the CCC has particularized expertise not possessed by courts and juries. Furthermore, the goals of the Consumer Fraud Act and the Act are not entirely consistent. The Consumer Fraud Act is concerned solely with the protection of consumers. The Act, however, has dual purposes that must be balanced— the protection of gambling patrons and the protection of the financial viability of the casino industry. *Id.* 5:12–1(b)(12). Finally, even prior to *Lemelledo,* this Court suggested that the extensive CCC regulation of the casinos precludes an action under the Consumer Fraud Act. *See Marcangelo,* 847 F.Supp. at 1228. Thus, we find plaintiffs' claim under the Consumer Fraud Act to be wholly without merit and we will not permit leave to amend the complaint to re-include it.

The remainder of plaintiffs' claims are not based on alleged violations of the CCC regulations and do not involve any federal claims. Because we have dismissed all the claims over which we had original jurisdiction and those state law claims implicating the same CCC regulations, we decline to retain jurisdiction over the remaining claims. We briefly address each of those claims below.

### H. *Public Accommodations Act*

Plaintiffs have withdrawn their Fourth Count alleging a violation of the New Jersey Public Accommodations Act, N.J.S.A. 10:1–2 et seq., and therefore this claim will be dismissed.

### I. *Personal Injury Claims*

Plaintiffs' Eighth and Ninth Counts assert personal injury claims on behalf of one plaintiff, Bolick, against the Sands casino for an alleged incident whereby Bolick was knocked out of his chair and then surrounded by casino personnel. These claims, asserting specific incidents of alleged mistreatment of one specific plaintiff by one specific casino, are clearly separable from the essential card-counting countermeasure claims at the heart of the rest of the complaint. We do not believe they form part of the same "case or controversy" under Article III. *See* 28 U.S.C. § 1367(a); *Gibbs,* 383 U.S. at 725–26, 86 S.Ct. 1130. Even if they did, we would decline to exercise supplemental jurisdiction because we have denied all claims over which the Court has original jurisdiction. 28 U.S.C. § 1367(c)(3). Plaintiff Bolick's Eighth and Ninth Counts will therefore be remanded to state court.

### J. *Privacy Claims*

Plaintiffs' Tenth Count, brought on behalf of six non-card-counting plaintiffs, asserts two privacy claims:[20] misappropriation of name or likeness for purposes of commercial publicity, and publicity that places plaintiffs in a false light before the public. In order to state a claim for misappropriation of name and likeness, plaintiffs must allege that a defendant has used his name or likeness "for the purpose of appropriating to the defendant's benefit the commercial or other values associated with the name or likeness …." *Bisbee v. John C. Conover Agency, Inc.,* 186 N.J.Super. 335, 342, 452 A.2d 689 (App.Div.1982); *see Tellado v. Time–Life Books, Inc.,* 643 F.Supp. 904, 909 (D.N.J. 1986). Here, defendants have not used plaintiffs' pictures for purposes of "taking advantage of [their] reputation, prestige, or other value associated with it," *Bisbee,* 186 N.J.Super. at 342, 452 A.2d 689, and therefore do not appear to make out a misappropriation claim.

Plaintiffs' false light claim likewise does not appear to state a claim upon which relief can be granted. Plaintiffs fail to establish that the alleged use of their names and likenesses would be "highly offensive to a reasonable person" and thereby have not stated a claim for false light. *Bisbee,* 186 N.J.Super. at 342, 452 A.2d 689; *Romaine v. Kallinger,* 109 N.J. 282, 293, 537 A.2d 284 (1988); *Tellado v. Time–Life Books, Inc.,* 643 F.Supp. 904, 907 (1986). Being labeled a card-counter does not rise to the level of

---

20. Plaintiffs have withdrawn their claims for unreasonable intrusion into private affairs and un- reasonable publicity regarding private facts, so we will dismiss these claims on that ground.

being "highly offensive to a reasonable person."

However, because these privacy claims do not arise from a "common nucleus of operative fact" with the CCC regulation claims upon which our federal jurisdiction is based, *Gibbs,* 383 U.S. at 725, 86 S.Ct. 1130, *see* 28 U.S.C. 1367(a), and because we decline supplemental jurisdiction over them pursuant to 28 U.S.C. § 1367(c)(3), we will remand these claims to state court.

### K. *Slander and Libel Claims*

Plaintiffs Eleventh Count alleges claims for libel, libel per se, slander, slander per se and injurious falsehoods on behalf of six specific non-card-counting plaintiffs and generally on behalf of all plaintiffs. Defendant Griffin and John Doe casino employees are named as defendants. In order to state a claim for libel or slander, a complaint must allege the defamatory words, the person who uttered them, and when, where, and to whom they were published. *See Zoneraich v. Overlook Hospital,* 212 N.J.Super. 83, 101, 514 A.2d 53 (App.Div.), *cert. denied,* 107 N.J. 32, 526 A.2d 126 (1986); *Kotok Building v. Charvine Co.,* 183 N.J.Super. 101, 103, 443 A.2d 260 (Law Div.1981). The statute of limitations for libel and slander is one year. N.J.S.A. 2A:14–3. Thus, a complaint must allege the publication of each defamatory statement within one year of the filing of the complaint. The statute of limitations in defamation actions is to be strictly construed. *Miele v. Rosenblum,* 254 N.J.Super. 8, 12, 603 A.2d 43 (App.Div.1991). In *Miele,* the defendant was charged with publishing two articles on specified dates and thereafter "continued to publish facts about plaintiff which placed plaintiff in a false light." *Id.* at 10, 603 A.2d 43. In granting the defendant's motion for summary judgment, the *Miele* court held that "[i]n the case of a complaint charging defamation, the plaintiff must plead facts sufficient to identify the defamatory words, their utterer and the fact of their publication. A vague conclusory allegation is

not enough." *Id.* Because the plaintiff in *Miele* failed to specify any facts with regard to the alleged subsequent defamatory publications, the Appellate Division held that the statute of limitations period relevant to the two specifically pled instances of defamation was applicable to the entire complaint.

Here, plaintiffs' complaint alleges that unspecified statements implying plaintiffs were card-counters involved in cheating activity were made by Griffin and hundreds of unidentified John Does "from on or about 1989 up until the present." Compl. at ¶ 413–28. However, the complaint fails to identify any specific statement made by any specific defendants about any specific plaintiff within the one year limitations period. We feel these allegations are simply too vague to demonstrate defamation within the statute of limitations. Furthermore, we find it likely that these allegations are too vague to set forth claims of defamation. Under New Jersey law, defamation is defined as: (1) a defamatory statement of fact; (2) concerning the plaintiff; (3) which was false; (4) which was communicated to a person or persons other than the plaintiff; (5) with actual knowledge that the statement was false or with reckless disregard of the statement's truth or falsity or with negligence in failing to ascertain the truth or falsity; and (6) which caused damage. *Feggans v. Billington,* 291 N.J.Super. 382, 391, 677 A.2d 771 (App.Div.1996); *see Petrocco v. Dover General Hosp.,* 273 N.J.Super. 501, 521, 642 A.2d 1016 (App.Div.), *cert. denied,* 138 N.J. 264, 649 A.2d 1284 (1994); *Kotlikoff v. Community News,* 89 N.J. 62, 67, 444 A.2d 1086 (1982). Without any specific allegations as to what was allegedly said about any specific plaintiff and by whom at what time, plaintiffs have failed to meet the requirements for setting forth a cause of action of defamation.[21] However, theoretically, there may exist a plaintiff who would be able to set forth more specifically the details necessary to demonstrate that he or she has been defamed within the one-year statute of limitations. Therefore, although there is no basis for us to retain

---

**21.** Plaintiffs' failure to meet the statute of limitations and pleading requirements for their defamation claim demonstrates precisely the problem with a complaint that lumps sixty plaintiffs, over

forty-one named defendants, hundreds of John Doe defendants and incredibly diverse causes of action together in one long and confusing document.

supplemental jurisdiction over this unrelated state claim, 28 U.S.C. § 1367(a) or for us to not to decline supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3), we will remand this claim to state court under the belief that there might exist a plaintiff who deserves an opportunity to amend the claim to properly allege cognizable defamation.

### L. Intentional Infliction of Emotional Distress

Plaintiffs have withdrawn their Twelfth Count alleging intentional infliction of emotional distress and therefore this claim will be dismissed.

### M. Claims Against Lawyer Defendants

Plaintiffs have alleged various claims against nine lawyer and law firm defendants arising out of alleged malpractice and negligence associated with advice and/or representation offered at different points in time by the different law firms with respect to the claims alleged in the current complaint. The Counts against these Lawyer Defendants include various state law claims of legal malpractice, including breach of fiduciary duty, negligence, breach of express, implied or oral contract, breach of the covenant of good faith and fair dealing, misrepresentation and negligent supervision. We find these claims, as stated, to be vague and confusing. For example, it is difficult to determine which firms represented which plaintiffs during which time period. It is also impossible to discern whether any of the firms failed to advise plaintiffs as to the proper statute of limitations as most of plaintiffs' underlying claims are murky conglomerations of various statutory, tort and contract actions. Furthermore, the viability of claims alleging incorrect legal advice with respect to the plaintiffs' essential CCC regulation claims may ultimately depend on the New Jersey Supreme Court's decision in *Campione*. Although we could properly dismiss these claims on these grounds alone, we feel the better course is to remand them to state court for further elucidation as to the alleged malpractice, particularly in light of the soon expected *Campione* decision. Because they arise from a completely different, though

perhaps tangentially-related, set of facts from the underlying CCC regulation claims, *see Gibbs*, 383 U.S. at 725–26, 86 S.Ct. 1130; 28 U.S.C. § 1367(a), and because we have dismissed all federal claims, we will decline supplemental jurisdiction over any of the state law claims against the Lawyer Defendants, 28 U.S.C. § 1367(c)(3), and remand these claims to state court.

### III. CONCLUSION

Plaintiffs' beef is with the countermeasures taken by casinos to frustrate card-counting blackjack players. The only real issue in this case is whether the Act authorizes the CCC to permit casinos to engage in this type of activity or to treat card-counters differently from other blackjack players. Plaintiffs' complaint is a verbose, confused, overreaching and immature work product, and its allegations of cheating, RICO, consumer fraud, constitutional violations, defamation and civil conspiracy confuse rather than elucidate the essential nature of the dispute.

We hold that the clearly expressed intention of the New Jersey Legislature to ensure the financial viability of the casino industry provides ample justification for the CCC regulations and practices permitting casinos, for example, to (1) "shuffle-at-will," (2) limit a player to playing and wagering on one hand at a table, (3) selectively limit the betting limit for a given player at a table, (4) count cards themselves to determine when the cards in the shoe should be reshuffled and (5) identify card counters and share this information with other casinos.

Even were we to conclude that the CCC has acted improperly or illegally in adopting these regulations or permitting these practices, this court would not be a proper forum in which to recover damages or seek equitable relief. The Appellate Division of the New Jersey Superior Court has recently held that the CCC has exclusive jurisdiction over claims that a casino has violated the rules of play and has clearly stated that "there is no private cause of action against a casino for its alleged violation of [CCC] regulations governing the manner in which games are played." *Campione*, 302 N.J.Super. at 118, 694 A.2d 1045. We had earlier agreed with

this position in a footnote appearing in *Tose v. Greate Bay Hotel Casino*, 819 F.Supp. 1312, 1316 n. 8 (D.N.J.1993), *aff'd*, 34 F.3d 1227 (3d Cir.1994). Our analysis was subsequently approved by the Third Circuit in *Hakimoglu v. Trump Taj Mahal Associates*, 70 F.3d 291, 293–94 (3d Cir.1995).

We further hold that when a casino conducts gaming activity either (1) in accordance with regulations adopted by the CCC or (2) openly in a manner not inconsistent with those regulations there can be no liability at common law or under the Act to a patron for gambling losses or lost winning opportunities, even if the New Jersey Supreme Court should ultimately determine that the CCC acted improperly in adopting the regulations at issue or in not stopping the casino from operating the game in the manner challenged. The legislative judgment giving the CCC the right to regulate the minutiae of gambling carries with it the right of the casinos to rely on the CCC when it exercises that judgment.[22]

For the foregoing reasons, we will dismiss with prejudice pursuant to Fed.R.Civ.P. 12(b)(6) all of the claims relating to the alleged violations of the CCC regulations. (First, Second, Third, Fifth, Sixth, Seventh, and Thirteenth Counts). Because the Court declines to exercise supplemental jurisdiction, the remainder of the claims shall be remanded to state court. 28 U.S.C. § 1367(a); 28 U.S.C. § 1367(c)(3). (Eighth, Ninth, Tenth, Eleventh, and Lawyer Defendant claims). Plaintiffs have agreed to the dismissal of the Fourth and Twelfth Counts, and we are denying permission to reinstate the Consumer Fraud Act count. An appropriate order will be issued accordingly.

---

**22.** We express no opinion as to whether (i) the CCC can grant monetary damages or awards to individual casino patrons or (ii) the Act or the common law provides or implies a private right of action in the courts in favor of a patron who suffers losses because a casino clandestinely conducts gaming activity contrary to or inconsistent with the CCC regulations, e.g., using "loaded" dice or fixing a roulette wheel.